## J. C. Long v. The State.

No. 2952. Decided April 26, 1905.

**1.—Murder—Dying Declarations—Predicate—Evidence.**

Where the deceased had said to his attending physician—who waited upon him at the time of his death and who testified that the gun shot wound produced it— "This is mighty bad, isn't it?" and the defense objected to same on the ground that the dying declarations of deceased were put in writing on the night of the homicide and that the above declaration was only an opinion of the witness, but the certificate of the judge to defendant's bill of exceptions showed that this testimony was admitted as a predicate for the introduction of the dying declaration as tending to show the mental condition of deceased, there was no error.

**2.—Same—Res Gestae—Evidence.**

Where the widow of deceased was permitted to testify that upon hearing the shot fired which killed her husband, she immediately ran to the place where the shooting occurred and finding defendant there exclaimed, "Oh, Mr. Long, what did you shoot him for!" and defendant replied, "Don't you come down here with your gun, I have got as much lead as anybody." Held no error.

**3.—Same—Motive—Evidence—Written Message.**

There was no error in admitting in evidence a note of defendant to deceased warning him to keep his stock out of the former's pastures, the note having been written on Thursday before the Saturday upon which latter day the homicide occurred and which was the first meeting of the parties after said message.

**4.—Same—Evidence—Clothes of Deceased.**

Where the jury gave the defendant for murder in the second degree the minimum punishment and no injury to defendant's rights are shown, there was no reversible error in exhibiting upon trial before the jury the clothes of deceased which he had worn at the time of the homicide. The admission of this character of testimony is permissible wherever it serves any legitimate purpose or tends to illustrate or explain anything or circumstance connected with the homicide, just like any other fact or circumstance, and the fact that it may prejudice or injure defendant could not be cause for its rejection, if it be relevant.

**5.—Same—Dying Declarations, Oral and Written—Bill of Exceptions.**

Where the bill of exceptions was not clear, and did not exclude the idea that the written dying declaration was admitted when a verbal statement of deceased was introduced in evidence and it appeared that this oral statement was independent of the written one and made at a different time; that the State was not seeking to introduce the contents of the written declaration and the trial judge qualified the bill by a statement that the State had not offered the written declaration; nor it appeared, if the written declaration was admitted that the oral statement was not in accord with the written one, there was no error.

#### 6.—Same—Evidence—Malice—Motive—Bill of Exceptions.

There was no error in the admission of defendant's testimony on cross-examination, to the effect that prior to the homicide he had stated that he did not endorse the religious views of deceased, there being nothing in the bill of exceptions to show that these religious views did not enter into defendant's motive or malice.

#### 7.—Same—Evidence—Weapon Used.

There was no error in identifying the rifle with which defendant shot deceased, by the defendant while he was on the witness stand.

#### 8.—Same—Evidence—Credibility of Witness.

There was no error to permit the State to cross-examine defendant why he did not report to the officers that he was shot at on the night previous to the homicide, it being the theory of the State that he was in fact not shot at and that he did not himself believe that he was.

#### 9.—Same—Former Grudges—Original and Impeaching Testimony.

Where defendant had testified that he and the deceased had been friendly up to a few days before the homicide, and the effect of this testimony was to limit the ill-feeling between them to a recent trouble arising from the depredations of deceased's mules on defendant's pasture, there was no error in admitting in evidence, both as original and impeaching testimony, the defendant's statement made about a year before the killing that he had been having trouble with his neighbors, mentioning deceased, and that if they did not stop bothering him he was afraid he would have to hurt some of them.

#### 10.—Same—Evidence—Threats—Defendants Declarations.

A declaration made by defendant on Thursday before the Saturday of the homicide, and subsequent to the delivery of a note to deceased to keep his stock out of defendant's pasture, to the effect that if deceased did not stop his mules from breaking into his premises or keep them out, lead was going to fly and that it would fly quicker and faster than anybody was expecting it, was admissible.

#### 11.—Same—Bill of Exceptions—Certificate of Judge—Practice on Appeal.

Where a bill of exceptions was not signed by the judge it cannot be considered on appeal; but if approved, it failed to show that a special charge was requested to ignore the argument of State's counsel.

#### 12.—Same—Credibility of Witness.

There was no error in permitting the State's counsel to ask the defendant on cross-examination why de did not report the previous shooting at him to the officers, in order to test his credibility as to whether he really believed that he was shot at, as he claimed in his examination in chief.

#### 13.—Same—Misconduct of Jury—Allusion to Previous Trial.

Where there had been previous mistrial and it was shown by the testimony of one of the jurors that one of his fellows had remarked in the jury room upon a subsequent trial that the former jury stood eight to four or ten to two upon the penalty to be inflicted, but that this matter could not be considered by them; and the juror who made this remark testified that some one of his fellows asked how the previous jury had stood and that he replied, "Eight to four," but this could not be considered by them; that there were three or four or probably five or six of the jurors present when this was said, and that this was all that was said, there was not such misconduct of the jury shown which authorized a reversal.

#### 14.—Same—Practice—Statute Construed—Affidavit of Jurors.

Article 817, Code Criminal Procedure, subdivision 8, provides that the misconduct of the jury may be brought to the attention of the court by affidavit of the jurors pro and con; and article 821 of the same code provides that the State may meet the issues by affidavit or otherwise; but this is largely a question of practice, and the mere facts that affidavits were not made, but the jurors were sworn and testified would not require a reversal, if the facts were otherwise produced or opportunity afforded to produce them. The essential matter being the information for the court to pass upon; and the fact that the trial

judge had instructed the jurors that if they were guilty of misconduct not to make affidavits but to appear as witnesses and testify, would not injure the rights of defendant where the jurors were summoned and brought into court and defendant refused to place all of them on the stand.

**15.—Charge of Court—Self-Defense.**

See charge on self-defense held to be favorable to defendant.

Appeal from the District Court of Erath. Tried below before Hon. W. J. Oxford.

Appeal from a conviction of murder in the second degree; penalty, five years imprisonment in the penitentiary.

The defendant admitted the fact that he committed the homicide, but claimed to have done so in self-defense. He claimed that the night before, he was shot at by some one from ambush and that on the day of the killing he armed himself for self-defense; that in returning from his field work with some of his children in his wagon, he passed deceased, who was mounted on a mule, at about dark, near the latter's home, returning home; that just as defendant had passed him, deceased said, "Hold up, Mr. Long," and that he stopped. Deceased said, "What of my stock has been bothering you?" Defendant replied, "Two mules"; the deceased asked, "Where do they get in?" Defendant replied, "Any place"; the deceased said, "There must be a lame place in the fence," and defendant replied, "If there is I don't know it." Deceased repeated that there must be a lame place in the fence and defendant repeated that the mules went in where they pleased; deceased said the mules did not jump; defendant then asked deceased whether he had wired up defendant's gate [this gate defendant claimed was wired up the night some one shot at him], and deceased said, he did; whereupon defendant replied, "If you are the man that wired up my gate, you must be the man that shot at me last night"; deceased remarked that he had not shot at defendant, but that his son had fired a gun somewhere about deceased's house. Just at that time, defendant testified, deceased pulled up the mule he was on to the left and made a demonstration to his back pocket, with his right hand and as he did this, defendant grabbed his gun and shot deceased; that he did so in defense of himself and children. Defendant denied making any previous threats, as testified to by the State's witnesses, or that he used the language attributed to him by the wife of the deceased before or after the killing; that he sent the note to deceased to keep his stock out of defendant's pasture with no ulterior purpose and that up to the time the deceased's stock got into his pasture and he was fired upon by some one, there was no ill-feeling between him and deceased.

The State, as disclosed in the opinion of the court, introduced among other circumstances the note and other declarations made by defendant at different times and to different persons to show motive and malice and that deceased was not armed as far as the witnesses knew.

The court charged upon the different degrees of murder, on manslaughter and self-defense; the latter, to which exception was taken,

was as follows:—"Upon the law of self-defense you are instructed, gentlemen, that homicide is permitted in law when inflicted for the purpose of preventing murder or the infliction of serious bodily injury, when the killing takes place under the following circumstances: First. It must reasonably appear by the acts or the words coupled with the acts of the person killed, that it was the purpose and intent of such person to commit such murder or to inflict such injury. Second. The killing must take place while the person killed was in the act of committing such murder or inflicting such injury, or after some act done by his showing evidently an intent to commit such an offense or to inflict such injury. * * * In this case, therefore, if the defendant killed J. T. Anderson he was justified in doing so if he did so to prevent Anderson from murdering or inflicting serious bodily injury upon him, the defendant or upon his children, provided it reasonably appeared to the defendant by the acts or the words coupled with the acts of Anderson, viewed from the defendant's standpoint that it was the purpose and intent of Anderson to murder or inflict serious bodily injury upon him, the defendant, or his children and provided, the killing took place while Anderson was in the act of murdering or inflicting serious bodily injury upon the defendant or his children, or after some act done by Anderson showing evidently an intent to murder or to inflict serious bodily injury upon him the defendant, or his children, viewed from the standpoint of the defendant, and Long was not bound to retreat in any event to avoid the necessity of killing Anderson. And if he believed his life was in danger he also had the right to arm himself to defend against such danger, or apparent danger, and would forfeit no right by doing so."

*Nugent & Carter* and *Wm. Panill,* for appellant.—Citing Crenshaw v. State, 12 Texas Ct. Rep., 758; Cole v. State, 8 Texas Ct. Rep., 141; Melton v. State, 11 Texas Ct. Rep., 744; Krebs v. State, 8 Texas Crim. App., 1; Felder v. State, 23 id., 477; White's Code Crim. Proc., art. 788.

*Howard Martin,* Assistant Attorney-General, for the State.

DAVIDSON, Presiding Judge.—This conviction is for murder in the second degree, five years confinement in the penitentiary being fixed as the penalty.

Dr. Allen, testifying in behalf of the State, over the objections of appellant, was permitted to state that he waited upon deceased at the time of his death; that the gun shot wound produced his death; that he had a conversation while attending deceased about his condition, and deceased used the following language, "This is mighty bad, isn't it?" or words to that effect. This occurred the morning after the difficulty. The grounds of objections were that the dying declarations of deceased were put in writing by justice of the peace Herring, on the

night of the homicide, and this was only the opinion of the witness, was not res gestæ, and inadmissible for any purpose and hearsay. The court signs this with the explanation that it was admitted as a part of the predicate for the introduction of the dying declarations. This testimony was admissible for the purpose stated by the court. While it was not sufficient to show within and of itself that deceased was then conscious of approaching death, it was admissible as tending to show his mental condition; and when taken in connection with the other facts in regard to this predicate we think was admissible.

The bullet taken from the body of deceased was offered in evidence. Several objections were urged to its introduction, which we think untenable. The widow of deceased was permitted to testify that upon hearing the shot fired which killed her husband, ran immediately to the place where the difficulty occurred; that defendant was in his wagon and she asked him, "Oh, Mr. Long, what did you shoot him for?" Defendant replied, "Don't you come down here with your gun, I have got as much lead as anybody." The objections urged were that the statement was not directed to deceased, could throw no light on the case, and was directed to another and different person than deceased; and further, was irrelevant. This testimony was clearly admissible; it was made immediately after the shooting, and was brought within the rule of res gestæ.

The State introduced the following note in evidence: "Mr. J. T. Anderson. I have not got a free pasture. Keep your stock out. J. C. Long." Various objections were urged to the introduction of this document. It was clearly admissible. One of the reasons for the trouble and killing was that deceased's (Anderson's) mules were getting inside the enclosure of appellant. The note was written on Thursday before the killing on Saturday. This was the first meeting after the note had been written by appellant to deceased.

A pair of pants and coat were exhibited before the jury and identified as those worn by deceased on the night of the homicide. Objections are, (1) that it tended to prejudice appellant before the jury; (2) immaterial; (3) could serve no purpose except to influence the minds of the jurors adversely to appellant; and (4) was not admissible for any purpose. We have held that under some circumstances the bloody clothes of deceased could not go before the jury. However, wherever they serve any legitimate purpose or tend to illustrate any question or explain any thing or circumstance connected with the homicide, the clothing is admissible. It may be further stated in this connection that the admission of this character of testimony is like the admission of any other fact or circumstance in the case. If admissible, the fact that it may prejudice or injure appellant would not be cause for its rejection. If it even remotely tends to elucidate or illustrate any theory or issue it is admissible, though it may not be of a cogent character. Its admission is like the admission of any other fact or circumstance, and before reversal would be required some injury must

be shown. It is not the introduction of all irrelevant or immaterial evidence that will cause reversal. Where it is of such slight consequence as not to have assisted in bringing about a conviction or the enhancement of the punishment, we do not believe an appellate court would be called on to reverse. We believe this matter comes within the above rule, and inasmuch as the jury gave appellant the minimum punishment for murder in the second degree, no injury is shown, even if erroneously admitted.

The daughter of deceased testified that she asked her father: "What did Mr. Long say to you, and how did he come to shoot you?" Deceased replied, "I stopped Mr. Long and asked him, 'What of my stock had been getting in,' and he said, 'Two mules,' and I asked, 'How? And he said, 'Wherever they wanted to, or took a notion to.' And I says, 'There must be a weak place in your fence.' He says, 'No, they get over whenever they take a notion.' He says, 'You must be the man that wired up my gate last night.' And I says, 'I did.' " The bill then recites, as follows: "And then he became so weak that he could not talk any more. And it was in evidence that Harper Herring, the justice of the peace, had taken his dying declarations in writing." Objection was urged that the declarations of deceased were taken properly and in writing, and was the best evidence of what occurred and are not accounted for, and are in possession of the State, and that the statement of deceased was in response to the questions propounded by the witness; that such conversation is not a part of the res gestæ, and that the statement is not a complete narration of what occurred at the time of the homicide. The court qualifies this bill with this explanation: "That at this time Herring had not testified, and no written declaration had been offered, and it was not shown that deceased had put in writing everything that showed how deceased received his injury." Where the dying declarations have been reduced to writing and signed by the declarant, it is the best evidence, and usually excludes verbal evidence of dying declarations, unless the absence of the written declaration is properly accounted for as a predicate for the introduction of the verbal statement. This bill is not clear or satisfactory. It does not exclude the idea that the written dying declaration was admitted. If the written declaration was admitted, and this statement was in accord with that, we do not see any objection to its being used by the State, or if contradictory of the written declaration, it might be used by appellant. Mr. Wharton in his work on Homicide, thus states the rule: "If the declaration of the deceased at the time of his making it, be reduced to writing, the written document must be given in evidence, and no parol testimony respecting its contents can be admitted. It has been held in England, that if a declaration in articulo mortis be taken down in writing and signed by the party making it, the judge will neither receive a copy of the paper in evidence, nor will he receive parol evidence of a declaration which is not itself produced, when its production is possible. But where the dying person repeats his declaration three

several times in the course of the same day, the fact of its having been committed to writing in the presence of the magistrate on. the second occasion, will not, it seems, exclude parol evidence of the others, where it is not in the power of the prosecutor to give that which has been committed to writing, in evidence." Wharton on Homicide, sec. 766; Greenleaf on Ev., sec. 161; Krebs v. State, 8 Texas Crim. App., 1. The State was not seeking to introduce the statements or contents of the written declaration. It was another statement made by him to a witness, other than the justice of the peace. If as a matter of fact, the State was seeking to introduce the contents of the written declaration, its loss not being accounted for, the objection would be well taken. But this is not the question. It was an independent statement. In regard to one of the rules above stated,—that is, that the dying declaration may be impeached or contradicted, by showing that deceased made statements contradictory of that introduced, see Felder v. State, 23 Texas Crim. App., 477. The bill does not exclude the idea that the written statement was introduced, or that this statement of the deceased shown by witness here complained of was contradictory of anything contained in the written declaration or that it was made at the same time; and under the rule laid down by Mr. Wharton, above quoted, we are of opinion, the evidence was properly admitted.

Appellant testifying in his own behalf stated on cross-examination he did not endorse the religious views of deceased prior to the time of the killing. It was objected to the introduction of this that every person under our Constitution has a right to worship God according to the dictates of his own conscience, and whether he liked the religious views of deceased or not, is irrelevant, and the introduction of this statement was prejudicial; and further that it did not tend to show malice. These are but grounds of objection and conclusions as stated in the bill. Whether these religious views entered into the motive of appellant would be a question of fact. There is nothing in the bill to show the contrary. It may be stated, as a matter perhaps of common notoriety, that differences in religious views have been productive of many serious personal and national troubles. It seems the tendency of the human mind to become very much excited at times over religious and moral questions. However this may be, we believe this was admissible to go to the jury for what it was worth. How far it may have entered into the ill-feeling of appellant towards deceased was a matter to be weighed by the jury, and the bill does not attempt to show that this matter did not enter into the questions of malice and motive.

The rifle with which appellant killed deceased was handed to him while testifying, and identified by him and admitted in evidence. There was no error in this under the decisions in this State.

Appellant was further asked on cross-examination why he did not go to the town of Duffau and report that he was shot at on the night previous to the homicide. He answered that he had work to do the next day picking cotton, and saw no officer to whom he could report

the shooting which occurred Friday night. Under the facts this testimony is clearly admissible. Appellant contended that he was shot at the night before as he approached his gate, which had been fastened by wire by deceased as he admitted. The State contended that he was not shot at, but that one of the boys of deceased at deceased's residence, shot off his gun, which was some distance from where appellant was at the time of the firing of the gun. We think this testimony was clearly admissible as affecting appellant's credibility, and his belief in the fact that he was shot at.

McCarty was permitted to testify that he had a conversation with appellant about a year before the killing, which conversation occurred in the town of Duffau. Appellant stated to him that he had been having trouble with some of his neighbors, mentioning the name of deceased; said they had been bothering him, and if they did not stop it he was afraid he would have to hurt some of them. It is urged that this is too remote and too general and was not evidence of malevolence towards the deceased, and not a threat directed at deceased. This testimony was clearly admissible. While testifying that he had no ill will towards deceased, appellant stated that he and deceased had been friendly up to a few days before the homicide; and the effect of his testimony was to limit their trouble to the fact that deceased's mules had been getting in his pasture or field a short time prior to the homicide, and which brought about the writing of the note to deceased. He denies having made this statement to witness McCarty. It tended to show that he had ill-feeling towards appellant long prior to the occurrence of the matters mentioned in and caused the writing of the note, and that his ill-feeling towards deceased was not of recent origin. In our judgment it was admissible as original as well as impeaching testimony.

Mrs. Jameson testified: "I saw Mr. Long on Thursday before the killing about 8 o'clock in the morning. He passed my house and stopped. We had a conversation. He told me in the conversation that someone's mules had been bothering him, and a little later on, he said it was Mr. Anderson's mules that had been bothering him, and that if he did not keep them out or from breaking in, or did not stop them, lead was going to fly, and that it was going to fly quicker than anybody was expecting it." It is urged that this statement is too general and is not directed towards deceased, and is not a threat against deceased; and that the facts and circumstances attending the homicide show it was not the moving cause of the killing, and it was immaterial and irrelevant. We cannot agree to these contentions. The note, previously mentioned, was written Thursday morning; this conversation occurred some day but subsequent to the delivery of the note at the house of deceased. The statement to Mrs. Jameson by appellant directly includes deceased by name. The occurrence at the homicide shows that it was the stock getting in the pasture about which the difficulty occurred, at least there were remarks made at the time between them with

reference to this stock. The statement was not too general and directly and personally mentioned deceased.

There is an unsigned bill of exceptions in the record in regard to some remarks of one of the attorneys for the prosecution. We cannot consider it in the absence of its approval by the judge. If approved, we would not deem it of sufficient importance to reverse. No special charge was asked, and perhaps it was a legitimate argument.

On cross-examination appellant testified that the reason he did not report the shooting at him on Friday night before the homicide on Saturday evening, was because he was afraid and excited, and he did not know when he would be shot. Objection was urged that a party who had been shot at is not required by the law to report that fact to officers; that it is irrelevant and immaterial and calculated to prejudice him in the minds of the jury. How far it may be the duty of a party who has been assaulted, waylaid and shot at to report to the officers is a matter that we do not propose to discuss here, and it is not necessary to discuss it. But the question was a proper one. It tended to affect the credibility of the witness, and his honest belief that he was actually shot at the night before. It was a fact for the jury to take into consideration in passing on those questions.

In the motion for new trial appellant sets up the misconduct of the jury. One of the jurors, Spurlock, testified that after the jury had retired there was something said about the former trial of appellant. One of the jurors asked how the other jury stood? Juror Zimmerman answered eight to four, or ten to two, but this had nothing to do with the case and the jury could not consider it. This witness was not positive whether Zimmerman used the words ten to two or not, but he said some one did use the words ten to two; and he understood that the ten to two jury hung on the question of either penalty or degree; that he understood further that these were all for conviction but differed as to penalty up to this time. This juror further says that they had disagreed as to the degree of the offense, that one of the jurors was for manslaughter. Zimmerman was sworn, and testified that he was a juror in this case, and that after the jury had retired and taken a vote, some one asked how the other jury stood, and he replied, "Eight to four," but that they could not consider that, as it had nothing to do with this case. There were three or four or maybe five or six jurors present when this happened. This was all that the witness said. He did not know how the jury stood as to conviction or acquittal; that he said nothing in regard to the former trial except as to how they were divided. He himself said nothing about the jury standing ten to two, no such an expression was used, it was not used in his presence or at that particular time and place. It was held in Morrison v. State, 39 Texas Crim. Rep., 519, that the mere announcement in the jury room that defendant had been previously convicted, and his punishment assessed at twenty years in the penitentiary would not constitute reversible error, unless some prejudice was shown to appellant. Moore v. State, 36

Texas Crim. Rep., 88, is to the effect that where the accused was on trial for robbery, where it was made a ground of the motion for new trial that the jury had received other testimony after their retirement, and it appeared that the newspaper containing an announcement that defendant was on trial for the robbery, giving a statement of the transaction, and that one of the defendants had already been tried and convicted and the accused was under indictment for murder in one county and other minor offense, and the juror made an affidavit that he did not read the article until they had agreed upon defendant's guilt, and none of the other jurors had read it so far as he knew, and that after reading it he agreed to a verdict of five years less than he had before fixed upon, and that the article did not influence his verdict, it was held that there was no prejudice and the conviction was not disturbed. To the same effect is Williams v. State, 33 Texas Crim. Rep., 128; and Munos v. State, 34 Texas Crim. Rep., 472; McDonald v. State, 15 Texas Crim. App., 493. The statute only prohibits the allusion in the argument to a previous conviction of the appellant in the same case after new trial awarded. So it would seem that in cases like this, where there had not been a previous conviction for the same offense, it is a matter to be judged from all the environments of the action of the jury and its probable effect upon their minds. There are only two jurors who testify in regard to the matter occurring in the jury room, and we do not believe it is shown that any injury resulted to him from their statements. The other jurors were present, but were not placed on the stand by either side. As presented, we are of opinion there is not such a showing as will require this court to reverse the judgment.

The motion for new trial further shows that the district judge instructed each jury for the week during the term that inasmuch as some of the cases to be tried before them had been tried more than once, not to discuss the result of any previous trial; that this would be misconduct; that if they were guilty of misconduct not to make affidavits for lawyers in the case; that such affidavits were ex parte, and not to make them, but to tell it, if any such misconduct happened, and talk to the lawyers on both sides of the case about it freely, and then appear on the witness stand where the court could protect them, and they would not get into any tangle about the mater, but not to make any affidavits. This was the statement of the judge under oath. The court qualifies this bill of exceptions by stating that the court gave defendant process for each of the twelve jurors, set the motion for new trial for a certain day, that he might have all of them present, and that appellant did not see proper to put them on the stand. The court enjoined on jurors not to make ex parte affidavits simply for their own protection, and not to deprive defendant of any right, as they are told, first, not to do wrong, and second, if they did, not to conceal that fact, but to tell it to counsel upon either side, and to swear truthfully about it before him, the judge, on the motion for new trial. Such is the bill as qualified. Subdivision 8 of article 817, Code Criminal Procedure, is, as follows: Where

through the misconduct of the jury, the court is of the opinion that the defendant has not received a fair and impartial trial, it shall be competent to prove such misconduct by the voluntary affidavit of the jurors, and the verdict may in like manner in such cases be sustained by such affidavit." Article 821, Code Criminal Procedure, provides: "The State may take issue with the defendant upon the truth of the causes set forth on the motion for new trial, and in such case the judge shall hear evidence by affidavit or otherwise and determine the issue." It seems to be largely a question of practice as to how the matter of the misconduct of the jury shall be brought to the attention of the court, and how the misconduct shall be shown. The statute, article 817, subdivision 8, supra, provides, it may be by affidavit pro and con; article 821, that the State may meet the issues of the causes by affidavit or otherwise, and the case on this issue thus determined. While it is safest, always, to follow the language of the statute or its commands in regard to this question of misconduct, still, the mere fact that affidavits were not made in obedience to the prior instructions of the court, would not necessarily require reversal of the judgment if the facts were otherwise produced, or if the opportunity was afforded and the accused declined to produce the evidence. The ultimate effect and intent of these statutes is to inform the court with the sworn statements, either written or verbal, of the facts attending and manifesting the misconduct. This court would not feel called upon to reverse a judgment where the facts have been adduced or tendered for introduction, if declined simply because they were verbal, and not set out in affidavits. The essential matter is the information for the benefit of the trial court, and in case of its rejection by that court or the overruling of the motion then for the inspection of this court on appeal. We do not see, under the facts, how appellant has been injured. The jurors were all brought in and tendered accused, and two of them placed upon the witness stand, and their testimony elicited. He declined to introduce the remaining ten. We do not believe the testimony of these jurors would have been any more cogent or truthful in affidavit than when detailed verbally under oath. There is no such error in this matter as requires a reversal of the judgment.

The charge of the court is criticised in regard to self-defense, because it is an admixed charge of real and apparent danger. The case made by appellant was one of apparent danger. We do not agree with the contention that apparent danger was not sufficiently given. The charge submits the entire trouble from the standpoint of appellant; that is, as to how he viewed the facts and the actions of deceased at the time he fired the fatal shot. In fact, we think the charge rather favorably presents the law than otherwise.

Finding no reversible error in the record, the judgment is affirmed.

*Affirmed.*

[Motion for rehearing overruled without written opinion.—Reporter.]