### JIM PETTIS v. STATE.

No. 1782. Decided October 16, 1912.

Rehearing denied November 13, 1912.

**1.—Murder—Evidence—Threats.**

Where, upon trial of murder, the bill of exceptions on appeal did not show the answer to the question objected to, the matter could not be considered; besides, the record showed that the testimony with reference to threats was admissible.

**2.—Same—Evidence—Res Gestæ—Declarations of Third Party.**

Where, upon trial of murder the State's testimony showed that defendant ran after deceased, caught her, and cut her throat, there was no error in admitting testimony that just before this defendant drew his knife and got out of a wagon, and the State's witness called to deceased to run, that defendant would kill her.

**3.—Same—Evidence—Husband and Wife—Cross-examination.**

Where defendant placed his wife on the witness stand, and she testified to very abusive conduct on the part of the deceased and that she told her husband and repeated the language to him, there was no error in permitting the State, on cross-examination, to ask the witness what remark, if any, was made by the defendant when she recited the incidents to him, as this was part of the conversation; besides, the answer was not hurtful to the defendant.

**4.—Same—Evidence—General Reputation.**

Where the State had not sought to impeach the defendant, there was no error in the court's refusal to permit him to prove his reputation for truth and veracity.

**5.—Same—Charge of Court—Instrument Used.**

Where, upon trial of murder the evidence showed on the part of the State a cold-blooded assassination, and that the instrument used by defendant was a knife with a blade over an inch and half in length and three-eighths of an inch in width, with which he cut deceased and said that he killed her and did not give a damn, there was no error in the court's failure in not charging the jury that if the instrument used was not one likely to produce death, etc., to acquit defendant of murder, or to instruct the jury as to defendant's right to approach deceased for an explanation.

**6.—Same—Cause of Death—Charge of Court.**

Where, upon trial of murder, there was some evidence that the wounds inflicted by the defendant upon deceased were not necessarily fatal, and the court submitted this question in a proper charge to the jury, and fairly submitted the issue of the cause of the death of deceased as made by the evidence, there was no reversible error.

**7.—Same—Charge of Court—Manslaughter.**

Where, upon trial of murder, the issue of insult to a female relative was raised and properly submitted to the jury, and there was nothing in the evidence to raise the issue of sudden passion and adequate cause on account of the conduct of the deceased at the time of the killing, there was no error in the court's failure to charge upon such issue.

Appeal from the District Court of Nacogdoches. Tried below before Hon. James I. Perkins.

Appeal from a conviction of murder in the second degree; penalty, fifteen years imprisonment in the penitentiary.

The opinion states the case.

*King & King*, for appellant.—On question of admitting declarations of third party: Felder v. State, 23 Texas Crim. App., 477; Sauls v. State, 30 id., 496; Roquemore v. State, 50 Texas Crim. Rep., 542; Hanna v. State, 46 id., 4; Casey v. State, 50 id., 392; Kenneay v. State, 57 S. W. Rep., 648.

On question of cross-examination of wife: Young v. State, 59 Texas Crim. Rep., 139; 127 S. W. Rep., 1058; Yeiral v. State, 56 Crim. Rep., 267; 119 S. W. Rep., 848; Stewart v. State, 52 Texas Crim. Rep., 273; Richards v. State, 53 id., 400.

As to question of cause of death: Morgan v. State, 16 Texas Crim. App., 593; Noble v. State, 54 Texas Crim. Rep., 436; Ex Parte Pettis, 60 id., 288; Johnson v. State, 65 S. W. Rep., 92; Nilan v. State, 60 Pac. Rep., 485.

On the question of the court's failure to charge on manslaughter: Henderson v. State, 65 Texas Crim. Rep., 15; Watson v. State, 50 Texas Crim. Rep., 171; 95 S. W. Rep., 115; Castro v. State, 40 S. W. Rep., 985.

On question of instrument used: Nicols v. State, 24 Texas Crim. App., 137; Matrinez v. State, 35 Texas Crim. Rep., 386; Fitch v. State, 37 id., 500; Henry v. State, 38 id., 306.

*C. E. Lane,* Assistant Attorney-General, for the State.—On question of declarations of third party: Griffin v. State, 50 S. W. Rep., 366; Castillo v. State, 31 Texas Crim. Rep., 45; Lewis v. State, 29 Texas Crim. App., 201.

On question of res gestae: Neely v. State, 56 S. W. Rep., 625; Hunter v. State, 54 Texas Crim. Rep., 224; Cook v. State, 22 Texas Crim. App., 511; Kenney v. State, 79 S. W. Rep., 817.

On question of cross-examination of wife: Merritt v. State, 39 Texas Crim. Rep., 70.

On question of cause of death: Powell v. State, 13 Texas Crim. App., 254; Morgan v. State, 16 id., 593; Wood v. State, 31 Texas Crim. Rep., 571.

HARPER, JUDGE.—Appellant was indicted, charged with murder, and when tried he was found guilty of murder in the second degree, and his punishment assessed at fifteen years confinement in ·the penitentiary.

1. In the first two bills of exception, appellant complains that the State was permitted to ask the witnesses Earnest and Jesse Hutchinson the question: "State to the jury what statement or remark in the nature of a threat, if any, you ever heard the defendant make to your mother, Belle Hutchinson (deceased), while she was living on his place." The answer to the questions, if any made, are not included in the bills, consequently the question is not presented in a way we can review the same. (Tweedle v. State, 29 Texas Crim. App., 586, and Sec. 1123, subdivision 3, White's Ann. Procedure.) However, if we turn to the statement of facts, we learn that the witnesses answered that they had heard the defendant say to their mother he would kill her if she ever left him. As she had left him and he had killed her, the testimony of this threat was admissible.

2. By bills three and four it is shown that witnesses were permitted to testify that Charlotte Belle called to deceased to run— that defendant would kill her. The evidence in the case, from the State's standpoint, would show that Belle Hutchinson, deceased, who had been living with defendant, had left him and gone to Charlotte Belle's house; that defendant came driving by and stopped his wagon in front of the house, and Belle Hutchinson and he engaged in a conversation; that after some words had passed, he raised up, drew his knife, and got out of the wagon, when this

224 TEXAS CRIMINAL REPORTS. [November,

remark was made by Charlotte Belle to Belle Hutchinson. The State's testimony further shows that Belle Hutchinson did run, and defendant ran after her, caught her and cut her throat, she dying a few days thereafter. This being the evidence on behalf of the State, there was no error in admitting the testimony. (Long v. State, 48 Texas Crim. Rep., 175; Jeffries v. State, 9 Texas Crim. App., 598.)

3. It appears that defendant placed his wife, Lizzie Pettis, on the witness stand and she testified to very abusive conduct on the part of deceased, and that she told her husband about it, and repeated the language to him. On cross-examination Lizzie Pettis was asked by the State, what remark, if any, was made by defendant when she recited the incidents to him. Appellant objected on the ground that he had not questioned her about the answer made by defendant, and the witness being his wife, she could not be compelled to testify. The defendant having introduced a portion of the conversation with his wife, the State was entitled to the whole conversation, in so far as it relates to the same subject. (Art. 791, Code of Criminal Procedure, and authorities cited in Sec. 1043, White's Ann. Code of Criminal Procedure.) However, if this was not true, the answer given by the witness as recited in the bill could not have been hurtful to defendant, but would rather be in aid of establishing that the defendant, if guilty of any offense, was guilty of no higher grade of offense than manslaughter, and this was his purpose in introducing the statements of the wife to him.

4. The defendant offered to prove his reputation for truth and veracity by several witnesses, and complains of the action of the court in refusing to permit him to do so. As the State had not sought to prove contradictory statements, nor impeach the defendant, there was no error in the ruling of the court. The fact that two witnesses swore defendant had made certain statements to them and in their presence at the time of the homicide, which statements defendant denied making when testifying as a witness, does not entitle him to prove his reputation for truth and veracity. (Hill v. State, 52 Texas Crim. Rep., 241, and Branch's Crim. Law, Sec. 877.)

5. Appellant excepted to the charge of the court in presenting the issues of assault to murder and aggravated assault on several grounds. The first is, because the court erred in not instructing the jury that if the instrument used was not one likely to produce death, it is not to be presumed that death was designed, unless from the manner in which it was used such intention evidently appears. The evidence shows that the instrument used was a knife, the blade of which originally was about three inches long, but which had been broken off, and the blade ground down to a point at the time of the killing, being a little over an inch and a half in length and three-eighths of an inch in width. The attending physician testified: "There was one wound from the left beginning a little below the

angle of the jaw and extending pretty nearly across the atracia— the wind-pipe; the second wound seemed to come from the right, and went into what we call the 'Adams Apple'; there was a stab wound at the angle of the left jaw, which broke off a piece of the jaw-bone, and a stab in the back of the neck; there were one or two minor cuts on the forearm, some cuts on the fingers, and a slight gash on the left shoulder. The wound in the throat was a cut clear across and gapped very wide. There were some blood vessels severed in the cut; a vein or two on the left side had to be taken up with clamps.'' In his judgment, he stated the death of Belle Hutchinson was caused by the knife wounds. Mosco Lee and Charlotte Belle, who witnessed the cutting, say that Belle Hutchinson asked defendant to bring her things to her, and he said he would if she would come and go with him after them. This she declined to do, when defendant got out of his wagon, pulled his knife and started towards deceased, when Charlotte Belle holloed to her to run, that defendant would kill her; deceased ran back through the house, around the house, and by the buggy Mosco Lee was sitting in, asking Lee not to let defendant hurt her. Lee requested defendant to desist, but he kept on after deceased, and Charlotte Belle says overtook her, stabbed her, jerked her down, got on her and inflicted the wounds described by the doctor, the deceased saying, ''Oh, don't kill me, don't kill me.'' Wallace Jones says that immediately thereafter defendant, in answer to a question, stated he had ''killed Belle and didn't give a damn.'' Defendant testified: ''I got off of the wagon and walked around Mr. Lee's buggy and then into the gate and as I got into the gate she goes back in the house and I walked in behind her. I goes in there with the intention to ask her about this trouble had between her and my wife, and when I goes in there she goes right on around and out the front gate and I just kept on up with her, she kinder vexed me there to think after she did that way going away from me and I just hurried on, and when I passed Mr. Lee's buggy she walked on sorter south of there and I just kept on up with her, and when I got up close to her she wheeled around. I saw a knife when she wheeled around, and I just clinched her hands and in clinching her hands in tussling over the knife she fell on the ground and I just got plum excited then, and when I come to myself I saw a little blood on my thumb, on my hand, and I just got up and throwed the knife down on the ground and I goes on down the street and met Mr. Stone. I never had any knife in my hand up until I overtook Bell.''

Under this evidence we do not think any jury would be authorized to find that serious bodily injury was not inflicted, nor could they arrive at any other conclusion than that defendant intended to kill. No presumption need arise from the weapon used, but the acts, conduct, and language of defendant clearly indicate his purpose in making the assault, and that it was to kill. He gets out of his wagon, starts towards the woman, she trying to leave him (according to his

testimony); he overtakes her, and he says takes her knife away from her, slashes and re-slashes her throat, drives the knife in the neck, cutting a part of the jaw-bone. We think Article 720 of the Penal Code applies to the evidence in this case, and not Article 719. The acts and conduct of the defendant at the time, under all the testimony, show an intent to kill when he did catch up with her, no matter what his intention was prior to that time. Walker v. State, 28 Texas Crim. App., 503; Duebbe v. State, 1 Texas Crim. App., 159. There was nothing in the record to suggest that defendant approached deceased for an explanation. While he says that was his original intention, yet he admits she fled from him, and he ran her down and cut her throat when he caught her. The court is not required to charge on an issue not made by the evidence.

6. The defendant proved by one of the attending physicians that the wounds inflicted were not necessarily fatal wounds, and he gave it as his opinion that if she had followed his instructions she would have recovered. The only way in which it was developed she disobeyed his instructions was that she got out of bed and walked about the house, when his instructions were that she must remain in the bed. He attributed the immediate cause of death to a blood clot forming, a result of the wound, which was carried to her brain through the arteries, and it would not probably have been so carried if she had remained in bed. On this issue the court instructed the jury:

"Homicide is the destruction of the life of one human being by the act, agency, or procurement of another. The destruction of life must be complete by such act, agency or procurement; but although the injury which caused death might not under other circumstances have proved fatal, yet if such injury be the cause of death without its appearing that there has been any gross neglect or manifestly improper treatment of the person injured, it is homicide. Such gross neglect or improper treatment has reference to the acts of some person than him who inflicts the first injury and would include the acts of the person injured as well as of the physicians, nurse, or other attendants.

"Now, if you find that the defendant cut or stabbed deceased with a knife in the neck or throat, thereby inflicting wounds which were not in themselves necessarily fatal, but from the effects of which deceased did thereafter die, then unless the deceased died from some gross neglect of herself such as a failure or refusal to obey the instructions of her attending physician, the defendant would be guilty of some degree of homicide as before defined in this charge; but if you believe the deceased was guilty of gross neglect such as above mentioned and that such neglect, operating in conjunction with the wounds, caused the death of deceased, which would not probably have resulted but for such neglect, or if you have a reasonable doubt as to whether or not such are the facts of the case, you

will find the defendant not guilty of any degree of homicide, but will then consider further whether or not he is guilty of assault with intent to murder or aggravated assault under the following instructions.''

Then follow instructions on assault to murder and aggravated assault. This charge, we think, fairly presented the issue of cause of death as raised by the evidence, and the jury finds against his contention.

7. The only other ground we deem it necessary to notice is that complaining of the charge of the court on manslaughter. The court presented a full and fair charge on manslaughter, based on insult to female relative, and of which there is no complaint, but it is insisted that other facts in the case raised the issue of sudden passion on adequate cause on account of conduct of· deceased at the time. The State's evidence would make it a very aggravated case of murder, while the defendant, while admitting he followed deceased and overtook her, says that when he did so she turned on him with a knife in her hand, and he ''clinched'' with her and took the knife away from her, when she fell; that he became excited, and when he came to himself the deed had been committed. Defendant insists that this turning on him with a knife was adequate cause. Article 1138 of the Penal Code provides: ''Though a homicide may take place under circumstances showing no deliberation, yet if the person guilty thereof provoked a contest with the apparent intention of killing or doing serious bodily injury to the deceased, the offense does not come within the definition of manslaughter.'' The defendant in his testimony offers no reason why he pursued the woman through the house, around the house, out of the yard, and around the buggy (where the testimony conclusively establishes she asked Mosco Lee to make him desist his pursuit), and on after her as she started towards on officer, seeking protection. If she had claimed that he merely intended to compel her to go home with him, or whip her for the insulting language to his wife, the issue might be raised; but he leaves us to grope in the dark as to his intention, unless we take the testimony of the State, which shows he pursued a defenseless woman with a knife in his hand, overtook her, and cut her throat from left to right, and then from right to left, driving the knife into her quivering flesh at the turn of the jaw, she at the time begging him not to kill her. And after it was over, when asked if he had killed her, he said, ''Yes, and he did not give a damn.'' We do not think the issue of manslaughter was raised by her conduct at the time.

The judgment is affirmed.

*Affirmed.*

[Rehearing denied November 13, 1912.—Reporter.]