### TOM HUNTER v. THE STATE.

No. 392.    Decided March 23, 1910.

Rehearing denied May 25, 1910.

**1.—Murder—Continuance—Want of Diligence—Discretion of Court.**

Applications for continuance are addressed to the sound discretion of the court, and this discretion is not the subject of review unless in case of abuse or arbitrary exercise of power; and where upon trial of murder it appeared that the motion was the second application for continuance, and that there was not sufficient diligence, the same was properly overruled.

**2.—Same—Evidence—Flight.**

Upon trial of murder there was no reversible error in permitting the State to show that the defendant was armed when he was arrested and a quantity of ammunition was found upon him, to show flight and the circumstances attending it.

**3.—Same—Evidence—Competence of Witness.**

Where, upon trial of murder, dying declarations were in evidence of the deceased, who was a child, there was no error in admitting evidence to show that the said witness had sufficient intelligence to understand his condition and the character of his wound.

**4.—Same—Evidence—Child Witness—Dying Declarations.**

Upon trial of murder, where dying declarations of the deceased were in evidence, there was no error to show the competence of said witness, if alive, before admitting his dying declarations.

**5.—Same—Evidence—Acts of Father of Deceased—Presence of Children.**

Upon trial of murder, where the evidence showed that the father of de-

ceased was killed at the same time, there was no error in admitting in evidence that for some weeks before the homicide, the father of the deceased had been carrying with him wherever he went some of his smaller children, which had not been his custom before that; it having been shown by circumstantial evidence that there was ill feeling between the parties, that they were close neighbors, and that the defendant had notice of this change of habit; such testimony serving to throw light upon the question as to who began the difficulty, etc.

#### 6.—Same—Evidence—Impeaching Witness.

Upon trial of murder there was no error in permitting the State after laying a predicate therefor, to impeach one of defendant's witnesses as to certain statements made outside of court, to the effect that he left home because his father wanted to arm him, etc., the court properly limiting said testimony to purposes of impeachment.

#### 7.—Same—Evidence—Impeaching Witness—Bill of Exceptions.

Where, upon appeal from a conviction of murder, the bill of exceptions disclosed that defendant's objection was not raised to the admissibility of the testimony on the question of impeachment, and that the objection urged on appeal was not called to the attention of the trial court at the time, the same could not be considered.

#### 8.—Same—Evidence—Moral Turpitude.

Where, upon trial of murder, the State was permitted to show on cross-examination of defendant, that a complaint had been filed against him for killing a negro, and there was no objection to the testimony on the ground of its remoteness, there was no error.

#### 9.—Same—Evidence—Credibility of Witness—Moral Turpitude—Presumption.

Upon trial of murder there was no error in permitting the State to show that defendant's witness had been charged by complaint with the offense of arson; and it will be presumed that such complaint was made before the proper authorities.

#### 10.—Same—Evidence—Character of Deceased—Father of Deceased—Leading Questions.

Where, upon trial of murder, the evidence showed that the deceased was a small boy who was killed at the same time that his father was killed by the defendant, and where one of defendant's witnesses had testified to the general reputation of the father of the deceased as that of a dangerous and violent man, it was competent for the State to show antecedent menaces, former attacks, etc., on the part of the defendant towards the father of the deceased and that the latter forbore to attack defendant during such former menaces and attacks, and this although some of the questions were leading but in the main related to collateral matters.

#### 11.—Same—Evidence—Dying Declarations—Oral and Written Declarations.

Where, upon trial of murder, defendant in his motion for new trial set up certain written dying declarations which the State had failed to introduce and which had not been discovered by defendant until after the trial, and it developed that said written declarations had not been read to the deceased nor signed by him and in no respect conformed to law, there was no error in permitting the State to introduce in evidence the oral dying declarations of the deceased; besides it was not shown that by granting a new trial a different result would have been reached, and there was no error in overruling defendant's motion for new trial.

#### 12.—Same—Argument of Counsel.

Where, upon trial of murder, the deductions sought to be drawn by State's counsel from the evidence were neither unreasonable nor unfair with reference to the character of the defendant, there was no reversible error.

#### 13.—Same—Charge of Court—Limiting Testimony.

Where, upon trial of murder, the court properly limited impeaching testi-

mony to the credibility of witnesses, there was no error in refusing requested charges on the same subject.

**14.—Same—Charge of Court—Dying Declarations—Voluntary and Spontaneous Declarations.**

Where, upon trial of murder, there was no issue that the dying declarations of deceased admitted in evidence were not voluntarily made, there was no error in the court's charge on this subject in the court's failure to instruct the jury that such declarations must be voluntary and spontaneous; besides the law does not require that dying declarations should be so made.

**15.—Same—Charge of Court—Impeachment of Witnesses.**

Where, upon trial of murder, there was evidence as to the impeachment of defendant's witnesses, there was no error in the court's charge limiting such testimony to purposes of impeachment.

**16.—Same—Charge of Court—Murder—Self-Defense.**

Where, upon trial of murder, the court properly charged on murder in the first degree, murder in the second degree, and self-defense, as required by the facts in evidence, there was no rror.

**17.—Same—Evidence—Undisclosed Motives of Deceased—Bill of Exceptions.**

Where, upon appeal from a conviction of murder, appellant's bill of exceptions as to the habit of the father of the deceased in carrying with him some of his smaller children, showed that it was not made on the ground of undisclosed motive of deceased's father, but was made on the ground of irrelevancy, etc., the first ground which was urged by defendant on appeal could not be considered.

**18.—Same—Bill of Exceptions—Practice on Appeal.**

The mere statement of the ground of objection in a bill of exceptions is not a certificate of the judge that the fact stated is true, and a bill of exceptions can not be aided either by a statement in reply to a motion for new trial or by the statement of facts.

**19.—Same—Practice on- Appeal—Grouping of Errors.**

Where, upon appeal from a conviction of murder, the appellant insisted that where there are a number of errors complained of which if taken alone would not be sufficient to warrant a reversal, but if taken as a whole do constitute reversible error, the court can only exercise its best judgment under the law, and where there is no error according to that judgment the case must be affirmed.

Appeal from the District Court of Guadalupe. Tried below before the Hon. M. Kennon.

Appeal from a conviction of murder in the first degree; penalty, imprisonment for life in the penitentiary.

The opinion states the case.

*Dibrell & Mosheim* and *J. W. Rainbolt,* for appellant.—On question of continuance: Hammond v. State, 28 Texas Crim. App., 413.

On question of admitting evidence as to amputation of leg of deceased: Foster v. State, 28 Texas Crim. App., 45; 4 Ency. Ev., p. 915.

Upon question as to whether deceased was capable of making a dying declaration: Jones v. State, 52 Texas Crim. Rep., 206.

As to question of admitting testimony as to habits of father of deceased in taking with him his smaller children and his undisclosed motives: Brumley v. State, 21 Texas Crim. App., 222; John-

son v. State, 22 Texas Crim. App., 206; Ball v. State, 29 Texas Crim. App., 107; Gilcrease v. State, 33 Texas Crim. App., 619.

Upon question of impeaching defendant's witness: Casey v. State, 49 Texas Crim. Rep., 174, 90 S. W. Rep., 1018; Jones v. State, 38 Texas Crim. Rep., 87; Winn v. State, 54 Texas Crim. Rep., 538, 113 S. W. Rep., 918.

On question of moral turpitude of witness: Dyer v. State, 77 S. W. Rep., 456; Bowers v. State, 71 S. W. Rep., 284; Carroll v. State, 32 Texas Crim. Rep., 431, 24 S. W. Rep., 100; Richards v. State, 55 Texas Crim. Rep., 278, 116 S. W. Rep., 587; Gardner v. State, 55 Texas Crim. Rep., 394, 117 S. W. Rep., 148; Bogus v. State, 114 S. W. Rep., 823; Brown v. State, 56 Texas Crim. Rep., 389, 120 S. W. Rep., 444; Choice v. State, 54 Texas Crim. Rep., 517, 114 S. W. Rep., 132.

Upon question of asking leading questions after witness became a State's witness: Stewart v. State, 52 Texas Crim. Rep., 273, 106 S. W. Rep., 685; Casey v. State, 49 Texas Crim. Rep., 174; Jones v. State, 38 Texas Crim. Rep., 87; Poole v. State, 45 Texas Crim. Rep., 348.

On question of dying declarations by parol when written declarations exist: People v. Glenn, 10 Cal., 32; Krebs v. State, 8 Texas Crim. App., 1.

*John A. Mobley,* Assistant Attorney-General, for the State.—On question of oral dying declarations: Long v. State, 48 Texas Crim. Rep., 175, 88 S. W. Rep., 203, and cases cited in opinion.

RAMSEY, JUDGE.—Appellant was charged by indictment filed in the District Court of Gonzales County on the 11th day of January, 1907, with the murder of one Ollie Van Dorn. Thereafter the case was transferred on change of venue to Guadalupe County. At a trial had in the last named county on May 5, 1909, appellant was by the jury found guilty of murder in the first degree, and his punishment assessed at confinement in the penitentiary for life.

This is a companion case to that of Boone Hunter v. State, reported in 54 Texas Crim. Rep., 224. In view of the many questions raised on this appeal, it seems, however, essential to make a somewhat fuller statement of the case here than is there made. The statement we now make is intended, however, to do no more than merely outline broadly the case so that the matters and questions discussed will be understood. Appellant was, at the time of the homicide, near middle age, and we infer that deceased was a trifle older. Both of them were married, and each had a large family of children. They lived close together. Until some two or three months before the killing the parties had been friendly, but for something like two months before the homicide the relations between appellant and D. M. Van Dorn, the father of Ollie Van Dorn, had

become very much estranged. Appellant is shown by the evidence to be a man accustomed to and who habitually carried arms for many years. The evidence shows that Van Dorn had not carried a gun of any kind until some two or three months before the killing. It is also in evidence that after the disagreement for the first time R. M. Van Dorn, when leaving his place, would carry one of his smaller children with him, evidently with the idea that being so accompanied he would be free from attack by appellant. On the day in question the elder Van Dorn had made one trip to a nearby gin, accompanied by an older son, had returned home, and was going with a wagon load of seed cotton to the gin accompanied by his son Ollie, a mere lad about ten years of age. To reach this gin he had to go close to where there was a gate leading into appellant's premises, and near this gate the killing occurred. The State introduces, among other things, a res gestae declaration of Ollie Van Dorn, testified to by Lorena Van Dorn, who says when she reached the wagon she asked Ollie who did the killing, who stated that appellant and Boone Hunter had fired the shots, and that they rose up from behind the gate and shot his father. She also testifies, and this becomes important later, that at this moment she looked and appellant and his son Boone were going to the house and that the girls were lying in the cotton field, when appellant called to them, and they rose up out of the cotton field and all ran to the house. The State also offered in evidence the dying declaration of Ollie Van Dorn, which was produced through his brother Earl, to this effect: "That on the way from the gin he seen Tom Hunter and Boone Hunter and he told papa there was Tom Hunter and Boone Hunter and they were going to kill him, and papa told him no, they were not, and drove on, and when they got right near Boone Hunter and Tom Hunter raised up and fired on them, and when they fired papa fired and they fired and papa fired again and they fired again and again, and then papa fell back in the wagon and Tom Hunter said to Boone Hunter, 'Shoot the little son-of-a-bitch, don't let him get away,' and Boone Hunter came out in the road and shot at me twice and missed me, and then stuck his gun in between the end gates of the wagon and shot me. He also said that when he drove up Tom Hunter said to his father to stick up his damn head, he wanted to shoot it off. He said that Tom Hunter said this as he and his papa drove up the lane toward them." There was introduced some evidence by the State showing many bullet holes in the wagon bed from different angles, some made by buckshot and others by larger bullets, which was stated or thought to have been fired from a Winchester rifle. The defendant testified and introduced a number of witnesses to the effect, in substance, that the elder Van Dorn fired first at him, or his son, and, indeed, had fired two shots before either of them returned his fire. Their testimony also raised the issue that the shooting of the young boy was an accident, or at

least a mere incident in the encounter between the parties. A number of daughters of appellant testified they were in the cotton field near by picking cotton, and confirmed appellant's contention that R. M. Van Dorn fired the first shot. This was sought to be met by the State by showing an examination made very soon after the homicide disclosed the fact, from the appearance of the cotton bolls and the ground, that no cotton had been recently picked at that point. It was shown to have rained on the morning of the killing, and the parties examining the premises stated there was no evidence of any sacks being dragged along the ground. There was also proof introduced by the State to the effect, in substance, that the first shots, as well as the last fired, were reports of a weapon other than the large rifle carried by Van Dorn. This is a mere outline of the case, but will, we think, be sufficient to render easily understood the many matters which we shall hereafter discuss. In this connection, it should be stated that some of the questions raised here are incidentally passed on in the case of Boone Hunter v. State, supra, but for the most part they are not covered by the decision in that case.

1. When the case was called for trial appellant made application for a continuance based on the absence of Frank Mills, who was alleged to reside at Wrightsboro, Gonzales County; W. D. Whitley, of the same residence; Rube Edwards, who was alleged to reside in Tom Green County, and Frank and Thad Gleghorn, who were alleged to reside in Baylor County. The purport of the testimony expected to be shown by these witnesses was to show threats made by D. M. Van Dorn against appellant, and the fact that such threats were communicated to him, and some other matters that are more or less immaterial. The application on its face does not state whether it was the first or subsequent application, though it conforms measurably to the requirements of a second application for a continuance. Attached to this application was the process issued for the several witnesses. This was contested by the State on the ground, among other things, that there was no diligence shown to procure the testimony of the Gleghorns, for the reason both of them had moved away from Gonzales County more than twelve months ago, and had notoriously resided in Baylor County ever since, and that appellant knew this fact, or by the exercise of ordinary diligence could have discovered the fact. This is shown, it should be stated, also by the affidavit of one Sim Edwards attached to the State's contest. The application was also objected to because it failed to disclose whether same was the first or subsequent application; and on the further ground that an application for continuance was filed in the case on the 14th day of December, 1908, and same was continued on the application of defendant on account of the absence of the witnesses, Thad Gleghorn, Frank Gleghorn, William Whitley and Rube Edwards, all of whom were named in the present

application for a continuance, and that no attachment had been issued for said witnesses since this date. In resisting appellant's motion for a new trial the State filed the affidavit of Frank Mills substantially denying the matters expected to be proved by him. We think, in the first place, that in view of the long time which had elapsed. from the time of appellant's indictment, and in view of the fact that this was at least the second application for a continuance, that there was no abuse of the discretion of the trial court in overruling same. Again, it may well be doubted whether in any event the diligence is sufficient. Before the adoption of subdivision 6 of our present Code, a continuance, where the application complied with the terms and requirements of the law, was a matter of right. However, under the law as it now stands, such applications are addressed to the sound discretion of the trial court, and this discretion is not the subject of review unless in a case of abuse or unless the record shows that it was arbitrarily exercised. As presented, we think there was no error in the action of the court in overruling the application.

2. It is urged that the court erred in admitting the testimony of one Johnston, sheriff of Gonzales County, a witness for the State, with reference to the fact that appellant was armed when he was arrested and a quantity of ammunition found upon him. This matter arose in this way: Mr. Johnston was asked something with reference to a second arrest of appellant, and stated that this was due to the fact that he had escaped; that this escape was effected by him in the night-time and by filing out of the jail; that he was at the time at Lockhart where he got the news that appellant had escaped the night before, and that he reached Gonzales about half past eleven o'clock on the same day, and that he was searching for appellant some three days before he found him. In this condition of affairs he was asked: "When you captured him, what did he have, if anything?" The answer was that he had a 32-automatic pistol, and a Colt's and Winchester; that he had plenty of cartridges, including about a box and a half of 32's and about seventy-five 44's; that the automatic pistol was a weapon that shot eight times, and that to fire same all you had to do was to pull the trigger and it would not stop after it got started unless you threw it in a tub of water. Appellant objected to the witness detailing what appellant had, and the circumstances of his arrest, for the reason that this evidence was immaterial, irrelevant and prejudicial to the rights of the defendant, and because a narrative of the details of the arrest and what appellant had in his possession did not tend to show the commission of the crime or to establish the defendant's guilt. In this connection it should be stated that the record shows that appellant had before the homicide ' about the same weapons and about the same ammunition on hand that he had after his escape. It is always competent to show flight and escape such as that effected by

appellant in this case. This was undoubtedly a circumstance to be taken against him. There was little or no occasion, we think, to have shown in detail the character of arms that he had, though it would have been competent, we think, to have shown that his escape was under such circumstances and with such arms as implied and indicated an effort to defy arrest, but we are not prepared to hold, especially under the facts of this case, that the introduction of these matters could, in the nature of things, seriously have injured appellant, or that they are sufficient to justify a reversal of the judgment of conviction.

3. The next objection relates to the action of the court touching the testimony of W. C. Haynes, who was permitted to testify that Ollie Van Dorn consented to have his leg amputated, and that the witness told him the probable effect the amputation would have, and the fact that after such statement he consented to the amputation. Practically the same evidence was admitted in the Boone Hunter case, supra, and was held to be admissible, though it does not appear that the precise objection here made was made in that case. We think the learned court does not indicate in any explanation attached to the bill of exception the ground upon which this evidence was admitted, but clearly it was admissible on two theories: In the first place, it was admissible as tending to show the seriousness of the wound, the dangerous character of the operation, and was a fact to be considered as throwing light on the issue that this lad knew and realized his impending death. It was still more clearly admissible on the proposition of showing his mental condition, his intelligence, sanity, and the state of his mind. This was to some extent put in issue by the appellant who sought to show by reason of the shock, loss of blood, and the administration of drugs, that this young boy did not have sufficient mind and intelligence to understand his condition or to narrate with intelligence the horrible events which had just happened. See Morgan v. State, 54 Texas Crim. Rep., 542.

4. The next error assigned relates to the action of the court in admitting the testimony of Mrs. Lou Van Dorn as to the training, intelligence and capacity of the deceased. Her testimony was to the effect that Ollie had gone to Sunday-School since he was three or four years old, and that she had taught him the difference between right and wrong, truth and falsehood, and that he was answerable to God for his wrongs; that there was a hereafter, and that there was a bad man and a good place, and further, that he was as intelligent as he could be and as bright a boy as anyone. In the Boone Hunter case, supra, where this same dying declaration was admitted, the objection was made that it was not shown that deceased would have been a competent witness, if alive, and that he was not sufficiently clear in his mind. While we held the declarations admissible under the facts there presented, it was no doubt

thought desirable, and we think the forethought to be commended to make some preliminary showing of such a condition of affairs as considering the witness' age would show him a competent witness, if alive, and on the stand. Considering his tender years, and all the circumstances in the case, we think it not only competent, but the better practice in a case like this to show, so far as the facts justify, the competency and intelligence and the responsibility in moral conception of such a witness.

5. The next question relates to the testimony of Mrs. Lou Van Dorn to the effect, in substance, that before the trouble between these parties Mr. Van Dorn had never taken his children with him when going away from home, but after the trouble he always took one of the little boys or girls with him, and never left without them. This testimony was objected to for the reason that it was immaterial, irrelevant, and could only tend to show to the jury that deceased expected trouble with defendant, and that he did not believe defendant would attack him in the presence of one of his little children. In this case there was a contention and claim by appellant that R. M. Van Dorn attacked him and had fired upon him first; that he had threatened him and that. he was expecting to be attacked by said Van Dorn. There was evidence of prior difficulties, especially the one to which the witness Spann testifies, which will be noted hereafter, and it was further shown that the parties lived so close together that the movements of one would, in the nature of things, be more or less known to the other. In view of all the facts, we think it was competent for the State to show, as throwing light upon who began the difficulty, and as to the reasonableness of appellant's contention that deceased first fired upon him, deceased's custom in respect to carrying his little children with him. The jury might well regard the fact of such helpless children being with him as of itself in the nature of a flag of truce and a mute yet living appeal for immunity from attack, and as giving hostage and pledge of his own peaceable intentions and purposes.

6. Again, it is urged that the court erred in permitting the State to ask the witness W. T. Hunter: "Whether or not he stated to one Parker in the latter part of July, 1906, that he left home because his father wanted to arm him and take him to Wrightsboro and get him into trouble, and that he had trouble enough of his own?" And in permitting the State to thereafter introduce the witness Parker, who, in substance, imputed to W. T. Hunter the language implied in the above question. When this testimony was sought to be introduced the only objection made was that "said predicate was upon an immaterial issue and was therefore irrelevant and immaterial and prejudicial to defendant." It is . now urged that the action of the court was erroneous further on the ground that as to this matter the witness Hunter was a witness for the

State, and not for the defendant, and that it was not permissible, in respect to said matter, for the State to impeach him. This last objection, however, was not made on the trial, and the attention of the trial court not in any manner called thereto. This testimony, as, indeed, all the impeaching testimony, was distinctly limited in the charge of the court to purposes of impeachment. It is well settled in this State that objections to testimony must set forth the objections that were interposed. That otherwise the action of the court below will not be revised. That inferences will not be indulged to supply omissions in bills of exceptions. That parties asserting the availability of supposed errors must make their bill of exceptions so full and certain in statement that in and of itself it will disclose all that is necessary to manifest the supposed error. Davis v. State, 14 Texas Crim. Rep., 645. It has further been held in respect to bills of exceptions to the rulings of the trial courts in admitting evidence for the State, over objections by the defense, that such bills must set forth the objections which were interposed and that objections not affirmatively presented are to be deemed as waived. Judge Willson in this opinion quotes, with approval from Mayo v. State, 7 Texas Ct. App., 342, the following: "Inasmuch as the judge can not discuss or comment upon the proposed evidence, but must simply decide upon the objections made to it, it seems fair to infer that all objections intended to be relied on must be clearly stated, so that he may act in reference to all, and that a failure to assert any objection would be tantamount to a waiver of all objections not affirmatively presented." "This rule," states Judge Willson, "is now well settled by repeated decisions of this court." See Bryant v. State, 18 Texas Crim. App., 107. Again, the assignment submitted by appellant is much broader than the bill of exception on which same is based. The assignment is that the court erred in permitting the question stated to be answered, and in permitting Frank Parker to testify that W. T. Hunter had made such statement to him. A reference to the bill of exception discloses the fact that same does not raise the admissibility of Parker's evidence, and in fact no bill was taken to the admission of Parker's testimony, nor does same appear to have been objected to in any manner. The only objection made was to the question asked W. T. Hunter, and his answer, which was negative. This, and this only, was objected to and excepted to.

7. Further objection was made on the trial to the following proceedings: Appellant, while a witness in his own behalf, was asked the following question: "I will ask you if there wasn't a complaint filed against you before a magistrate, in Bastrop County, for killing a negro?" to which appellant replied, "Yes, sir, when I was a boy, 19." To this question appellant objected "for the reason that same was immaterial and irrelevant, and did not tend to discredit the defendant as a witness." There was no suggestion in the

objection that the transaction inquired about was too remote. In the case of Payne v. State, 50 S. W. Rep., 363, it was held, in respect to a similar matter, that "The objection that testimony was immaterial and prejudicial to accused is too general." There it was sought to be proved that Payne had previously been indicted for the offense of burglary of another house than the one in question. In speaking of this objection, Judge Henderson says: "This is entirely too general and does not state any specific ground of objection to said testimony." This rule is bottomed on the principle that fairness to the court below and to this court requires that the specific objection should thus be interposed. If it had been done there would have been opportunity given the trial court to have intelligently acted on the matter and in view of the entire record, it can scarcely be doubted that this action of the court would have been in accordance with the precedents. Almost this precise question was decided adversely to appellant in the case of Sue v. State, 52 Texas Crim. Rep., 122. In that case the State was permitted to ask one W. L. Lemmons if he had been indicted for murder. Objection was made to the question on the ground that it was not a crime carrying with it moral turpitude. The witness answered that he had been so indicted about twenty-five years ago and was acquitted. In disposing of the matter, the court say: "This is not a proper objection to this testimony. We think murder does involve moral turpitude. Appellant's counsel, as stated above, does not object to the testimony on the ground that it is too remote. In the shape the bill is in, there is nothing requiring our review." On the trial of the case, counsel for the State asked the witness Joel Screws if he had not been indicted in Wood County about twenty years ago for criminal assault? The same objection was made to this testimony. In disposing of the matter, the court makes this observation: "Certainly this offense involves moral turpitude, although too remote to be inquired about under the decisions of this court, but the latter objection was not made." In respect to the mere matter of impeachment, in view of the objections urged, and as the matter is presented in the record, we do not feel that we should reverse a judgment, which, in every other respect, is beyond question free from error.

8. Nor was there any error in the action of the court in permitting the State to prove, in impeachment of the testimony of the witness, W. T. Hunter, that he had been charged by complaint with the offense of arson. This was an offense involving moral turpitude and was a matter of recent occurrence. It must be presumed and assumed in the absence of proof to the contrary, that this charge was made to the accredited authorities under their sanction and advice and was a circumstance proper to be considered by the jury.

9. The next assignment of error relates to the action of the court touching the testimony of one A. J. Spann. This witness had been introduced by the defendant for the purpose of proving the general reputation of deceased, Van Dorn, as to whether he was a man of dangerous and violent character or otherwise. The witness was thereupon turned over to the State, and, among other things, the State undertook to prove, and was permitted to prove some of the details of the difficulty between appellant and deceased, and the elder Van Dorn, in which appellant appears to have accosted deceased in an angry manner, and that during the controversy he heard something like a pistol clicking, and that appellant's hand was to his side, and that he jumped between the two men, and that his son came out of the office and grabbed appellant around the waist and carried him out of the back door; that during this time Van Dorn stood there with his knife in his hand leaning on a sugar barrel; that he did not catch Van Dorn, neither did his son, and that Van Dorn made no effort to assault appellant. When this testimony was offered appellant objected that the questions asked him were leading, and suggested to the witness the answers desired, and because the witness Spann, not having been interrogated by defendant about any matter except the general reputation of the deceased, became a witness for the State upon the matters inquired about, and that it was improper to ask him leading questions. That some of these questions are leading, we think, can admit of no doubt, but, in the main, they relate to collateral matters of no very great importance, forming no part of the fatal meeting, and in view of the evident intelligence of the witness, we do not think that the matters urged are of sufficient importance to justify a reversal. It has been held in more than one case, that the asking of a leading question, even in respect to a vital issue, is not ground of reversal. Snodgrass v. State, 36 Texas Crim. Rep., 207. This matter was reviewed in an able opinion recently delivered in this court by Judge McCord, in the case of Carter v. State, where all the authorities are collated, and the matter exhaustively considered. It was, of course, clearly competent to show antecedent menaces, former attacks, spite, illwill, rage, resentment, and an evil mind on the part of appellant towards deceased, and it was equally as competent to show that notwithstanding the most serious provocation, that deceased forbore to make any attack upon appellant.

10. The next matter, and one not free from difficulty, relates to the action of the court in permitting the State, over objection of appellant, to introduce in evidence the dying declarations of Ollie Van Dorn made verbally to Earl Van Dorn, and reproduced upon this trial by said Earl Van Dorn, for the reason that since the trial of this case, it has been shown that a written dying declaration was made by said Ollie Van Dorn, which fact was not discovered by

the defendant until after the trial of the case. It is urged by the State that this ground of objection is not available to appellant, because he was lacking in diligence in discovering the matter earlier. In the light of the entire record, which we have carefully examined, we do not think that negligence can be fairly imputed to appellant or his counsel, and that their discovery of what is claimed to be a written dying declaration, was not due to any want of care on their part. This declaration is as follows: "On this day, about four p. m., my father, Douglas Van Dorn, and myself took a load of seed cotton to Mr. Greer's gin. While returning from the gin to our home on Salt Creek in said county, when we arrived at a gate belonging to Mr. T. A. Hunter, said gate being about 350 yards from the residence of said Hunter, said Hunter and his son Boone, near said gate, the said Tom Hunter said to said Douglas Van Dorn, God-damn you, stick up your head. The said Hunter ordered me, the said Ollie Van Dorn, to get off the wagon, and then the said Hunter ordered his son, Boone, to shoot me, the said Ollie Van Dorn. Boone Hunter fired the first shot, using the Winchester gun which he fired at me, the said Ollie Van Dorn. The said Boone Hunter fired his Winchester gun a second time at me, the ball from which broke my right leg, after which the said Boone Hunter broke and run. When the wagon in which my father, Douglas Van Dorn, and myself were traveling approached the said Tom Hunter and his son Boone, my father was sitting on the cotton seed with his head above the side boards. T. A. Hunter, after saying to my father, stick up your head, God-damn you, fired his shotgun at my father, Douglas Van Dorn, the shot from the gun of said Hunter passed through the plank of the wagon bed and wounded my father, Douglas Van Dorn.

"The above statement was made before me, the undersigned authority, by the said Ollie Van Dorn, who appeared to be of sound and disposing mind and memory. Said statement was made by said Ollie Van Dorn on the 21st day of August, 1906, about 10 p. m.

"J. C. Kuykendall,
"Justice of the Peace of
Precinct No. 5, Gonzales County, Texas."

It should be here stated that this statement was made at a different time and under different circumstances from that introduced by the State. It is further urged by the State, that in respect to this declaration, that there was no such showing made that same was made under a sense of impending death as would have justified its admission in evidence. It appears by the affidavit of J. C. Kuykendall that he was 77 years of age; that he arrived at the Van Dorn home on the evening of August 21, 1906, and that about 10 o'clock that night, or a little after, Ollie Van Dorn made a statement to him,

relating to the shooting of his father, D. M. Van Dorn, and himself. He then says: "I reduced his statement to writing, and the subject of death was not mentioned or alluded to by either Ollie Van Dorn or myself. I asked him questions as to how the shooting took place and who did it. At that time I was justice of the peace of Precinct No. 5 of Gonzales County, in which precinct the tragedy took place." Mr. Atkinson, the district attorney, filed an affidavit to this effect: "That I never heard any issue raised in this case in reference to a written statement made by the deceased, Ollie Van Dorn, to J. C. Kuykendall until after the trial of said cause, to wit, on the 20th day of May, 1909; that immediately upon hearing from the defendant's attorneys, that they desired to see said statement, I took the first train out of the town of Seguin, and went to Gonzales, where said statement was locked up in my vault along with other papers relating to cases pending in which the State of Texas is interested. I alone knowing the combination of my vault, had to go to Gonzales in order to obtain said statement from the vault where it has been ever since handed to me by J. C. Kuykendall, before the trial of the case of Boone Hunter. Upon conversing with the said J. C. Kuykendall, it was found that statement was in nowise a dying declaration, and could not be used as evidence in the case, and I further state that said statement has never left my possession from the time that I received it until now, and is in exactly the same condition that it was when I received it from the said J. C. Kuykendall and in the same envelope."

To this appellant replies, that having in view the testimony of Earl Van Dorn, that it is a fair, if not necessary, assumption that if his state of mind in respect to impending death was such as to make his declaration, made to his brother, admissible, that under the same proof the statement made to Kuykendall would also be admissible. We are not sure that this is a complete answer to the State's contention. However, we do not regard this as important. The controlling question, as we view the matter, is that this statement was not in *writing,* in the sense of being a statement signed by the deceased. It might be that a jury would have attached special importance to it in view of the fact that the statement was reduced to writing by the witness at the time, but it was, after all, Kuykendall's act and Kuykendall's writing, and not that of deceased. The proposition submitted by appellant that "where a dying declaration has been reduced to writing it is incompetent to prove such declaration by parol testimony, and it is immaterial whether the witness by whom such testimony is attempted to be reproduced orally, heard the declaration before they were reduced to writing," which proposition is to some extent supported by the authorities cited by him. Drake v. State, 25 Texas Crim. App., 293; People v. Glenn, 10 Cal., 32; Krebs v. State, 8 Texas Crim. App., 1. It is doubted if the rule, even if correct, can have much, if any, application. The

rule seems to be that where the State reproduces a dying declaration which is one of several made by deceased, though he made one in writing, the oral declaration is admissible if it was made at a separate and distinct time from the written declaration. The rule that secondary evidence of the contents of the written document is not admissible, does not apply in cases of this sort. Long v. State, 48 Texas Crim. Rep., 175, 88 S. W. Rep., 203; Phillips v. State, 50 Texas Crim. Rep., 127; McCullogh v. State, 50 Texas Crim. Rep., 132. In the case of Brown v. State, 54 Texas Crim. Rep., 121, a number of dying declarations of the deceased, Johnson, were admitted in evidence, and, among others, one in writing. It is undoubtedly true that where dying declarations are reduced to writing, and a defendant introduces such written declarations in evidence, he is entitled to prove by parole evidence other declarations made contemporaneously and not reduced to writing, notwithstanding they may contradict the writing. This was the rule announced in Herd v. State, 43 Texas Crim. Rep., 575, 4 Texas Ct. Rep., 700. This doctrine seems to be supported by the cases of Felder v. State, 23 Texas Crim. App., 477, and Drake v. State, 25 Texas Crim. App., 293. Therefore, that this declaration made to Kuykendall would have been admissible in disparagement to the one testified to by Earl Van Dorn, we do not doubt, and this without reference· to whether the last could be regarded as a written or verbal declaration. However, we think it may well be doubted whether, under the rules regulating the granting of new trials for impeaching testimony, this last declaration could have been of value to appellant, and it seems certain to us that, in the nature of things, it is not of a character that probably would have changed the result. There is one clause, "The said Hunter ordered me, the said Ollie Van Dorn, to get off the wagon," which it was strongly urged, would have been helpful to appellant, but it would have been practically impossible to have offered this without offering the remaining portion of the sentence, "and then the said Hunter ordered his son Boone to shoot me, the said Ollie Van Dorn." To have authorized the court below or to warrant this court in granting a new trial on account of this newly discovered testimony, it ought, in the first place, to be such as might reasonably have changed the result, and such as would probably have been used by appellant, introduced by him upon the trial of the cause, and such as would have been of substantial benefit to him. We do not believe on any of the grounds urged, or on any view that may be taken of this matter, that the court below was required to grant a new trial or that we would be justified in reversing the judgment of conviction.

11. Attention is called to the argument of Mr. Adolph Seidemann, and the contention is earnestly made that this argument was improper and prejudicial, and that for same the case should be reversed. His statement was to this effect: "Let us see who in this

case, is such a man as is liable to kill a man. The defendant has testified that he was on terms of deadly enmity with his neighbor, Mr. Cardwell; that he was on terms of deadly enmity with his father-in-law, Mr. McGinty, and had been for twenty-five years, and he testified that about four months after Mr. Van Dorn moved next to him the hard feelings between him and Van Dorn commenced, and the facts show that he attempted to draw a gun on deceased in Gonzales. Now, from these facts, do you believe that the defendant is such a man as would waylay and assassinate a man? The defendant has testified that he was charged with the murder of a negro, but that indictment was never returned," etc. To this a general objection was made, and the court thereupon requested said counsel to keep in the record and not discuss the character of the defendant, but failed to give any other instructions to the jury or to tell them to disregard such argument, to which action of the court exception was taken. It seems to us that the deductions sought to be drawn by counsel were neither unreasonable nor unfair. In any event, the statement of the court must have been understood by the jury as sustaining appellant's contention to the extent that from the remarks of counsel it could be understood that there was any reference to appellant's character.

12. Again, complaint is made of the refusal of the court to give the following special instruction:

"In this case you are instructed that evidence was offered and permitted to go to you to the effect that the defendant had been charged by complaint with murder and that such testimony was permitted for the sole purpose of affecting the credibility of the defendant as a witness, if it does so affect his credibility, and not for the purpose of putting his character in issue, and you will not consider such testimony as in any manner affecting the character of the defendant and you will disregard any argument on the part of any attorney for the State upon the character of the defendant, except as it may relate to his credibility as a witness."

This instruction was refused, but the court did give in charge to the jury the following: "If there is evidence in the case, tending to show that previous to the occasion under investigation, the defendant had been legally charged with the unlawful killing of another, you are instructed that you must not consider such evidence for any purpose other than as it may (if it does) affect the weight to be given the testimony of the defendant as a witness in this cause, and his credibility as such witness." We think the instruction contained in the general charge of the court is sufficient.

13. Among other instructions given by the court was the following: "In regard to the alleged dying declarations of Ollie Van Dorn, you are instructed that before you can consider the evidence purporting to reproduce such declarations, you must find from the evidence that at the time he made such declarations (if he did so)

he was conscious and sane, and that he was conscious of impending death, and had no hope of recovery. If this is not established by the evidence, then you will reject altogether from your consideration any evidence which may tend to show that such dying declarations were made." The objection is that this instruction unduly directed the attention of the jury to such declarations and they were led to believe that it was not necessary that such statement should have been made voluntarily and spontaneously. There is no merit in this contention. Under the facts of the Boone Hunter case, supra, it was held, as a matter of law, that this dying declaration was sufficient. Here, however, both in respect to the sense of impending death, as well as on the issue of mental capacity, an issue was made. This precise question came before the court in the case of Brown v. State, supra, where it was held that where upon a trial for murder testimony as to certain dying declarations of deceased was admissible, the court should nevertheless have charged the jury that said declarations must be voluntarily uttered, and that deceased at the time was rational and conscious of impending death. There was in this case no issue made by the testimony that the statement was not voluntarily made. The law does not require that they should be spontaneously made in the same sense that is required of res gestae declarations, nor is it an answer to the admissibility of such declarations that they were made at the solicitation or even suggestion of someone else, even if these facts appeared in evidence.

14. Nor was there any error in the action of the court in giving the following charge: "Witnesses may be impeached by showing that they have made other and different statements out of court, or upon a former judicial investigation of the facts, from those made before you on the trial. You may consider such impeaching evidence, as it may tend to affect the weight to be given the testimony of the witnesses so impeached, and their credibility; but such impeaching evidence is not to be considered by you as tending to establish the alleged guilt of the defendant, or any fact in the case." Among others, the witness W. T. Hunter had been impeached in respect to a matter of such importance as that if same had not been limited by such a charge as this, the error would have been manifest and ground of reversal. The giving of this charge was not only proper but required.

15. A number of objections were taken to the charge of the court, which we deem unnecessary to set out in detail. After defining murder in the first degree, and murder in the second degree, the court, in applying the facts to the law of murder in the first degree, charged the jury as follows:

"All persons are principals who are guilty of acting together in the commission of an offense. When an offense is actually committed by one person, but another is present, and knowing the unlawful intent, aids by acts, or encourages by words or gestures, the

person actually engaged in the commission of the unlawful act, such person so aiding, or encouraging is a principal offender. Any person who commands or advises another to commit an offense, and is present when the same is committed in pursuance of such command or advice, is a principal offender. As a general rule, the guilt of one, who does not actually perform the act of killing, but who is present when the act is done, and who aids by acts or encourages by words, the person actually doing the killing, depends upon the unlawful intent of the actual perpetrator of the crime, and the knowledge of the aider or abettor of such unlawful intent. This rule, however, is not invariable. If one with express malice command another to slay a third party, and the command is obeyed, and the homicide is unlawful, then he who commands such homicide and is present when the same is committed in pursuance of such command, would be guilty of murder in the first degree, regardless of the question of the degree of guilt of the person actually committing the act.

"If you find from the evidence that about the time charged in the indictment, and in Gonzales County, Texas, the defendant did unlawfully, with express malice, kill the said Ollie Van Dorn, by shooting him with a gun; or if you find from the evidence that about the time charged in the indictment Boone Hunter did, unlawfully and with express malice, kill the said Ollie Van Dorn, by shooting him with a gun, and that when the said Boone Hunter shot the said Ollie Van Dorn, the defendant was present, and knowing the unlawful intent of the said Boone Hunter in so shooting the said Ollie Van Dorn, did with express malice encourage the said Boone Hunter in so shooting the said Ollie Van Dorn; or if you find from the evidence that about the time charged in the indictment, and in Gonzales County, Texas, the defendant did unlawfully and with express malice towards the said Ollie Van Dorn, command the said Boone Hunter to kill the said Ollie Van Dorn, and that in pursuance of said command the said Boone Hunter did unlawfully kill the said Ollie Van Dorn by shooting him with a gun, and that when the said Boone Hunter so shot and killed the said Ollie Van Dorn the defendant was present, you will find the defendant guilty of murder in the first degree and assess his punishment at death, or confinement in the penitentiary for life, in your discretion.

"If you have a reasonable doubt of the guilt of the defendant of murder of the first degree, you will acquit him of that offense, and may then consider whether he is guilty of murder in the second degree."

On the issue of self-defense, the court gave these instructions:

"Homicide is permitted in the necessary defense of one's person, or the person of another, from any unlawful and violent attack, such as produces a reasonable expectation or fear of death, or of some serious bodily injury; and the person who is so unlawfully attacked

or acts in the defense of another from such attack, is not bound to retreat in order to avoid the necessity of killing the assailant. If it reasonably appear to the defendant, judging from his standpoint alone, that his life is in danger, or that he is in danger of serious bodily injury, or that the life of another on whose behalf the defendant acts, is in danger, or that such other is in danger of serious bodily injury, from any unlawful and violent attack made or about to be made by the deceased or by anyone apparently acting with him, then the defendant or anyone acting in his behalf, had the right to slay such person; and under such circumstances the defendant would be guilty of no offense. When a person is acting in defense of himself, or in defense of another, under the rules herein given you, and while so acting accidentally kills a person not engaged in the difficulty, such defendant is guilty of no offense.

"If you find that, on the occasion under investigation, either Boone Hunter or the defendant Tom Hunter did kill the said Ollie Van Dorn by shooting him with a gun, but that when the said Ollie Van Dorn was so shot, D. M. Van Dorn had shot at or apparently shot at either Boone Hunter or the defendant Tom Hunter, before any shot was fired by the defendant or Boone Hunter (if either of them did fire a shot), you will acquit the defendant; or if you have a reasonable doubt whether the death of the said Ollie Van Dorn was caused in an effort of either Boone Hunter or the defendant to defend himself or the other from an unlawful attack made, or apparently about to be made by D. M. Van Dorn, with a gun, upon either Boone Hunter or the defendant, you will acquit the defendant."

We think that these instructions, considered in connection with the charge of the court limiting the testimony and defining murder in the first degree and murder in the second degree, in a most lucid and admirable manner submitted the issues arising under the evidence.

We have, in view of the great punishment imposed, and out of deference to the able brief and earnest plea of eminent counsel upon oral submission, reviewed and discussed practically every question raised on the appeal. The case impresses us as having been well tried, and we are firm in our belief that there is no error in the record of which appellant, as the matters are presented, can complain. So believing, it is ordered that the judgment of conviction be and the same is hereby affirmed.

*Affirmed.*

ON REHEARING.

May 25, 1910.

RAMSEY, JUDGE.—In the original opinion in this case we considered and treated practically every question relied upon for a reversal of the judgment of conviction. This opinion was prepared

after a most careful examination of the record as well as a most careful consideration of the questions presented. As to how correctly the matters were decided by us, must, of course, in the nature of things, be a matter of opinion. The motion for rehearing filed challenges the correctness of most of the questions at issue. We are content to rest the case and the decision of this court upon our original opinion except upon two questions, which are urged with such earnestness and presented with so much ability that we feel that some further treatment of them is due alike to ourselves, to counsel and to the profession.

1. It is strongly urged that the court was in error in admitting in evidence proof of the fact that for some weeks before the fatal meeting the elder Van Dorn had been carrying with him wherever he went some of his smaller children, which had not been his custom before that. It is urged that this was inadmissible for the reason that the acts and conduct evidencing the secret and undisclosed intentions and purposes of Van Dorn unknown to appellant were not receivable in evidence against him. There is no doubt that the rule is well settled that where upon a trial for murder the acts, declarations and statements of the deceased in respect to or which evidence his peaceable intentions and motives are not admissible where such facts are unknown to defendant. The rule is thus well stated in the case of Johnson v. State, 22 Texas Crim. App., 206: "It is a maxim of the law that a man is only bound so far as matters reasonably appear to him; he can not be bound by motives locked up and hidden in the breasts of others. Deceased's undisclosed and undiscovered motive in going to Caddo Mills was not a material issue, and could throw no light whatever upon the guilt or innocence of defendant, whose motives alone were the important issue to be tried." See also Brumley v. State, 21 Texas Crim. App., 222; Pratt v. State, 53 Texas Crim. Rep., 281. And the rule is also true, we think, that acts and conduct of the decedent of a peaceable character and from which the jury would draw the inference that he had no purpose or disposition to attack his adversary, where his conduct would seem at variance from such purpose, would not be admissible where the motives, reasons and inducements which prompted such conduct are unknown to the person sought to be affected thereby. On the general proposition submitted by appellant, we think there can be no difference among lawyers. The matter is so thoroughly settled in this State as not to admit of doubt. We think, however, that as applied to this case, that this rule can have no application, and that same can not be made available to appellant. In the first place, the bill of exception does not contain any objection of this sort. When this proof was offered, it was objected to for the following reasons: "That same was immaterial, irrelevant, prejudicial and did not tend to prove any material issuable fact in the case." It will thus be noticed that the testimony was not objected

to on the ground now urged, nor is it recited or found to be true as a fact that the habit of deceased with reference to carrying his children with him was not known to appellant at and before the fatal meeting. It is clear, therefore, and manifest that under the rules governing this court, the matter now urged is not available. This question of practice was thoroughly considered, and the authorities cited in the case of Douglas v. State, 124 S. W. Rep., 933, where it was held that the mere statement of a ground of objection in a bill of exception is not a certificate of the judge that the fact stated is true, and that a bill of exception can not be aided either by a statement in reply to motion for new trial or by the statement of facts. We think, however, that in any event, if the matter was presented so as to demand and require a review of the question, that there was no error committed by the trial court. If we look to the evidence, the facts are such as to raise the issue and the statement of facts contains strong testimony, the fair purport and effect of which is to visit appellant with notice of this change of habit and with the fact that the children of deceased for some time had been going with him wherever he went. It will not be questioned that if this had been proven by the direct testimony of some witness, bringing home direct knowledge thereof to appellant, that this would render the testimony admissible, although the fact may have been denied by him; nor is it seen why the same matter could not as well have been proven by circumstances pertinently showing the fact. There was no charge requesting that the evidence be disregarded in the event the jury should believe and find from the evidence that the fact in question was not known to appellant.

2. The next question presented is with reference to the dying declaration admitted in evidence. The proposition, as we understand, relied upon by appellant is to the effect that inasmuch as there was, as claimed, a written dying declaration, and since it was in the possession of the State, that it was not competent for the prosecution to offer in evidence the parol dying declaration without accounting for and offering the written dying declaration. As we understand, it is not necessary in this case to decide this question, and if it be conceded the rule is true as contended for by appellant, it can have no application here. This was not, as we believe, under any of the decisions or any authority cited by appellant, in any legal sense a written dying declaration. This whole matter arose on appellant's motion for new trial, and the circumstances under which the purported written declaration was taken appears in the affidavit of J. C. Kuykendall. This affidavit is to this effect:

"My name is J. C. Kuykendall. I am 77 years of age and have resided in Gonzales County, Texas, my present place of residence, for thirty-six years. I know the Van Dorn and Hunter families. On the evening of August 21, 1906, I was sent for to go to the home of D. M. Van Dorn. I arrived there at about 8 o'clock p. m.

About 10 o'clock, or a little after in the night, Ollie Van Dorn made a statement to me relating to the shooting of his father, D. M. Van Dorn and himself. I reduced his statement to writing and the subject of death was not mentioned or alluded to by either Ollie Van Dorn or myself. I asked him questions as to how the shooting took place and who did it. At that time I was justice of the peace of Precinct No. 5 of Gonzales County, Texas, in which precinct the tragedy took place."

It will thus be seen that according to the statement of Mr. Kuykendall the statement, when reduced to writing, was not read to decedent, Ollie Van Dorn, nor did he affirm in any way the correctness thereof. Touching such a statement the rule is thus well stated in 4 Encyclopedia of Evidence, p. 988:

"Where declarations are reduced to writing in behalf of one who is dying, they are not admissible in evidence unless it is made to appear that he fully understood and assented to them, and, as a general rule, it should be proved that the declarations after being reduced to writing were read over to the declarant and approved by him. Where the declarations have been reduced to writing, so much of them as were not made and assented to by the declarant should not be received in evidence, but if the substance of the declaration as made by the declarant is written down and is assented to by the declarant, this will be sufficient.

"The formal parts of a dying declaration may be drawn by the officer out of the declarant's presence, and if it appears that after the declaration had been fully prepared the declarant assented to it, the declaration will be admissible in its entirety.

"The minute or memorandum of dying declarations is not admissible in evidence unless it was signed by the declarant or by someone in his behalf, but where written declarations are not signed by the declarant, they may, nevertheless, be proved by parol, and a witness who heard such declarations may use the writing for the purpose of refreshing his memory."

There is, as we believe, no case in the books—there certainly is no well considered authority which holds that a written instrument not signed by a decedent nor read over to him, nor affirmed by him to be correct, has ever been held to be receivable or to be treated as a written instrument, nor do the authorities so hold. This question in a very early day came before the Supreme Court of Pennsylvania in the case of Com. v. Stoops, Addison's Reports, 381. In that case Stoops had been indicted for the murder of his wife. Her deposition taken in writing by a magistrate about five days after the injuries and signed by him, was offered in evidence. It was objected to for several reasons, among others, on the ground that the deposition was not signed by the deponent and it was therefore imperfect and inadmissible. Discussing the matter the court say:

"The objection, that the deposition is not signed seems to rest on

cases of examinations under certain acts of parliament, or of unfinished examinations. But if the declarations of the dying person had not been written, nor sworn to, would they not have been admissible?

"In the case of the King v. Reason and Franter, the dying declarations of Mr. Luttrel, though not on oath, were given in evidence by a witness who heard them. And it was held that a paper on which his declarations on oath were written by the same witness, who was not a magistrate, though not signed by Mr. Luttrel, or by the magistrate who administered the oath, would have been better evidence than the memory of the witness. In Woodcock's case the dying declarations of a wife murdered by her husband, taken on oath, and reduced to writing by a magistrate, and signed by him, with her mark made on the paper in approbation of its contents, were admitted in evidence on an indictment of murder against the husband; and on this testimony he was convicted and executed. This case was tried before judges of great learning and talents. Nor does it seem absolutely necessary for the competency of such evidence that such declarations should be made under an immediate apprehension of death, though that be one great ground of their competence and credit.

"We will admit the testimony; but the point may be reserved."

In the case of Green v. State, 43 Fla., 552, 30 S. E., 798, a statement was offered in evidence made by one Lee, which was authenticated by R. E. Pate, a justice of the peace, and which contains recitals to the effect that Lee was of sound mind and believed he was going to die, and in this state of mind made a dying declaration, which is the subject of inquiry, the details of which then follow. This was objected to on the ground that it did not show deceased to be conscious at the time that his death was imminent, and that he entertained no hope of recovery, and also that the same was not signed by deceased or witnessed. Discussing this matter the court uses this language:

"We are of the opinion that the court erred in admitting in evidence the writing set out above. No testimony was introduced on the subject of whether the deceased thought death imminent and was without hope of recovery at the time the alleged statement was made by him, but the writing was introduced as independent evidence. It was not signed by the deceased, nor is it shown that it was read to and assented to by him as being correct. At most, it is the bare statement in writing of a person styling himself a justice of the peace that the deceased made the statement set out in the writing. The justice signing the paper was not produced, and gave no testimony in reference to any statement made by the deceased. He asserts, under his hand and seal, that such statement was made before him; but there is no statutory authority for justices of the peace to so certify dying declarations, and the certificate

in this case is not entitled to be considered as proof of the facts attempted to be certified. State v. Fraunburg, 40 Iowa, 555; 1 Greenl. Ev. (16th ed., by Wigmore), sec. 161. The ruling admitting this paper in evidence was clearly erroneous, and purporting, as it ·does, to come from an official source, had greater force in impressing the minds of the jury."

Another case cited by appellant in his motion is that of People v. Callaghan, 4 Utah, 49. In that case a dying declaration was offered which was signed by three persons. It is objected to, among other grounds, because it was a written statement of others not signed by deceased, and the real words given by deceased were not introduced or offered. In that case it appeared that the statement, after being written out, was read to the person making same before being signed by a witness, and that the decedent was at the time so feeble he could not sign his name to the paper. In this connection the court say: "The writing was properly admitted in evidence. There can be no question but that the declarations were made under the present apprehension of impending death, and were within the rule that, to render such declarations admissible, they must be made in articulo mortis.

"In the enfeebled 'state in which the deceased then was, and the difficulty in obtaining answers, there was no ground for excluding the declarations, because they were answers to leading questions.

"Where such declarations are taken down in writing, at the time they are uttered, although not signed by the deceased, being more reliable and accurate than the memory of most men, they should be produced and read at the trial."

This case probably goes as far as any case that can be found to sustain appellant's contention, but this language, it must be remembered, was in respect to a case where the paper before being signed was read over to the person making same. It further appears that before making the statement the decedent had been sworn to state the truth, and further, that at the time of the declaration his hand and arm were bandaged and that he could not for that reason sign the paper, but that he knew he was making a dying declaration to be used as evidence.

The other case cited is that of State v. Sullivan, 41 Iowa, 142. That case seems directly to support our position. The facts of the case are not given at any length, so that we quote entire that paragraph of the opinion discussing this matter:

"Two witnesses testified to the dying declarations of deceased, and one of them, it was shown, reduced the declarations to writing, but they were not read to nor signed by the deceased. It is, as we understand counsel, claimed that the testimony of the witnesses should not have been received for the reason that the absence of the writing was not accounted for. This would have been correct if the writing had been signed by deceased, or probably read to

and pronounced by him correct. It was, however, a mere memorandum made by the witness. See State v. Tweedy, 11 Iowa, 350."

In the case of Phillips v. State, 50 Texas Crim. Rep., 157, 94 S. W. Rep., 1051, Judge Davidson uses this language: "If declarant had signed the document this question would have been absolutely at rest and it would have been necessary to introduce it. If he did not sign it, it seems from the authorities it was not necessary to introduce the written statement, and that oral testimony was sufficient." That Judge Davidson's statement under the facts of the case then in hand is correct we have no doubt. As a general proposition, it may be that the doctrine is rather too broadly stated. However, as applied to the facts here, we have no sort of doubt that the testimony as to dying declaration was admissible under any rule ever adopted by this court or under any of the decisions cited and relied upon by appellant.

3. It is stated in motion for rehearing that there are in the record a number of errors complained of which, "if taken alone, would not be sufficient to warrant a reversal of this case, but if taken as a whole and in connection with the many other errors which may seem slight to this court, constitute one great and flagrant error for which this court should reverse this case and direct that defendant have a fair and impartial trial upon legal and competent evidence and not upon such evidence as violates the well established rule that has been laid down by our courts for our guidance in defending the rights of our fellowmen." In this case, as in many of the cases that reach us, where litigants are defended by able and zealous counsel, and where the prosecution is conducted with equal zeal and ability, we have an illustration of the irrepressible conflict between contending forces, one of which magnifies into injustice every passing act of the trial court, not having the sanction of direct authority, and the other of which minimizes confessed departures from precedent as harmless error. The office of this court in holding a steady hand between these two conflicting forces is one not to be envied. We can only declare, after a careful study, our best judgment with little hope that at the time it will receive the approval of both parties, but when we have so examined the question carefully and impartially, and declare our best judgment upon these contentions, under the law, aided by reason and diligent investigation, we have done all that we can be expected to do. This much has been done in this case, and our best judgment is that there is no error in the proceedings of the court below of which appellant can complain, and that his motion for rehearing should be as it is hereby overruled.

*Overruled.*