### DICK GILLIAM v. THE STATE.

No. 8804.   Delivered April 22, 1925.

1.—Murder—Evidence—Acts of Appellant—Held Admissible.

Where testimony was admitted as to appellant having carried a pistol, and having borrowed a pistol some days prior to the homicide, and made the statement that he wanted the gun for protection because he could not afford to fight a man like deceased fair, and also that appellant afterward showed witness a pistol which he said he had bought, such testimony is not objectionable on the ground that it disclosed other offenses that is, carrying a pistol. It is well settled that any competent evidence which tends to defeat the defense urged is admissible, although it may tend to show, or does show, another offense. Following Craig v. State, 23 S. W. 1108 and other cases cited.

2.—Same—Evidence—Same Subject.

So also was it admissible to prove that the witness Sanders stated to the defendant, that deceased claimed to have caught witness and himself playing cards, and wanted witness to go to the county seat and report the matter against defendant, whereupon defendant said if deceased "turned him [defendant] in he would never remember turning in the next one." Such testimony was not objectionable on the ground that the threat was conditional. The relevancy of a threat is not affected by the fact that they are impersonal, or conditional, where the circumstances show that they were directed toward or included deceased. Wharton on Crim. Ev., p. 1702, sec. 908, Vol. 2. Following Russell v. State, 84 Tex. Crim. Rep. and other cases cited.

3.—Same—Evidence—Motion to Withdraw—Properly Refused.

Where appellant permits testimony to be introduced, as to collateral facts without objection, a motion to withdraw same, made after the case is closed, was properly refused. Following Harrelson v. State, 60 Tex. Crim. Rep. 534, 132 S. W. 783 and other cases cited.

4.—Same—Charge of Court—Defense of Property—Erroneously Refused.

Where the evidence disclosed by the testimony of appellant, and one of his defensive theories presented, was that he killed deceased in the defense of his property, it was reversible error for the court to fail to submit this issue in his charge to the jury. Every defensive issue raised by the evidence, from whatever source it may come, or however incredible it may appear, under the laws of this state must be affirmatively submitted in a proper instruction to the jury. See Arts. 1105 and 1107 P. C. Following Williams v. State, 129 S. W. 838 and other cases referred to in that opinion and other cases cited herein.

Appeal from the District Court of Franklin County. Tried below before the Hon. R. T. Wilkinson, Judge.

Appeal from a conviction of murder; penalty, twenty years in the penitentiary.

The opinion states the case.

No brief filed by appellant.

*Tom Garrard,* State's Attorney, and *Grover C. Morris,* Assistant State's Attorney, for the State.

HAWKINS, JUDGE.—Defendant is under conviction for the murder of O. F. Crone. Punishment is twenty years' confinement in the penitentiary.

Defendant and deceased lived upon land which belonged to a Mr. Horn. Deceased as Horn's agent had rented to defendant the land worked by him. The killing occurred on the · morning of September 20th at defendant's home. Friction had arisen between the parties. Some time before the killing two children of deceased had gone to defendant's house and had been followed by a dog which bit one of the defendant's children, however, not injuring it to any extent. Defendant killed the dog. If deceased raised any disturbance because of this the record does not disclose it. Some disagreement had come up between defendant and deceased about other matters referred to in discussing some of the bills of exception. There were no eyewitnesses to the killing save defendant and his wife. Witnesses who arrived at the scene shortly after the homicide described the location of the body of deceased which was lying near a gate and upon asking defendant what the trouble was one witness was told, "I don't know." Defendant replied to another witness who remarked, "It looks like you have had some trouble." "Yes, but it is not worth while to state it here." Defendant and deceased lived some four hundred yards apart. In going from the home of deceased to the land worked by him they went by defendant's house. Deceased had started from home on the morning of the killing with some of his children but had forgotten the cotton scales and turned back to get them. The children went on to the field.

Defendant complains because the State was permitted over his objection to prove by the witness Sanders that for a period of about ten days immediately preceding the killing he had seen defendant off of his own premises wearing a shoulder scabbard for a pistol, on the ground that said evidence was admitting the proof of the commission of another offense by defendant, to-wit: unlawfully carrying a pistol. This witness had testified that some ten days

or two weeks before the killing defendant had sought to borrow witness' pistol and also to buy it. He told witness he wanted the gun for protection because he could not afford to fight a man like deceased fair. Witness declined to loan the gun but defendant went to witness' house and got it, later returning it. Afterwards defendant showed witness a pistol which defendant said he had bought. Defendant admitted while testifying as a witness in his own behalf that he had been carrying a pistol in a shoulder scabbard but undertook to explain his conduct in this respect by saying he was expecting trouble from some parties in Titus County over some meat which had been stolen from him. It is further in evidence from defendant that he was not on good terms with deceased on account of deceased not having fixed a well which defendant claims he ought to have done, and on account of deceased injuring some of defendant's cotton by driving over the ends of the cotton rows, and also because deceased had broken one of his doubletrees. The cases cited by defendant holding evidence of other crimes inadmissible we think have no application in a case like this. It is well settled that any competent evidence which tends to defeat the defense urged is admissible although it may tend to show or does show another offense. This principle is illustrated by Craig v. State, 23 S. W. 1108; Bedford v. State, 170 S. W. 728, McKinney v. State, 8 Texas Crim. App. 626; Asbeck v. State, 70 Texas Crim. Rep. 225. See also Wharton on Homicide, Sec. 598, 1st Bishop Criminal Procedure, Sec. 1067. Defendant sought to justify himself on the ground of self-defense. The evidence objected to was admissible to show preparation, premeditation and malice.

Objection was also interposed to the State proving by Sanders that about ten days before the homicide he told defendant deceased claimed to have caught witness and defendant playing cards and wanted witness to go the county seat and report the matter against defendant, whereupon defendant said if deceased "turned him (defendant) in he would never remember turning in the next one." The objection was two-fold, first that the evidence sought to encumber defendant with proof of another offense, (playing cards), second, that the threat was conditional, depending on a contingency never shown to have transpired. The first ground of objection is disposed of in the discussion of the preceding bill. The threat would have been meaningless without information as to the subject-matter of it. To support the objection that the threat was conditional, and therefore inadmissible Macklin v. State, Texas Crim. Rep., 144 S. W. 951, it cited. The threat in that case was rejected as not being shown to have been directed toward deceased. It was peculiarly worded, and some language in the opinion indicates that it should also have been rejected because conditional in its nature. Aside from the fact that it was not shown to have been used with

reference to deceased, the other reason for holding it inadmissible is reflected in the statement by the writer of the opinion that "This threat is too uncertain in its character, and is too indefinite, we think, to be admissible under the facts of this case and the authorities." We do not regard the case as authority for excluding proof of conditional threats by one accused of murder where they show animosity, ill will and malice towards the party afterwards slain. Mr. Wharton states the rule very succinctly in Sec. 908, p. 1702, Vol. 2, Wharton's Crim. Ev., as follows: "The relevancy of the threats is not affected by the fact that they are impersonal or conditional, where the circumstances show that they were directed towards or including the deceased." Numerous cases from this court have followed the rule thus announced. (See Russell v. State, 84 Texas Crim. Rep. 245, 209 S. W. 671, Pace v. State, —— Texas Crim. Rep., ——, 153 S. W. 132; Brewer v. State, —— Texas Crim. Rep., ——, 153 S. W., 622; Owen v. State, —— Texas Crim. Rep., ——, 105 S. W. 513; Dowell v. State, 58 Texas Crim. Rep. 482, ——, S. W. ——; Harrelson v. State, —— Texas Crim. Rep. ——, 132, S. W. 783.

Bills three and four relate to the same subject and may be considered together. In both of them complaint is made at the refusal of the court to withdraw certain testimony which had been introduced by the State. The killing occurred on the morning of September 20th. The State had proven without objection that the district court and the grand jury were in session at Mr. Vernon on September 19th, and had also proven by a son of deceased that he and his father had gone to Mt. Vernon on that day and carried some cotton, leaving Mt. Vernon about four-thirty in the afternoon and returned to their home. Bill number four recites that the testimony of deceased's son was admitted over objection of defendant. If this evidence was in fact objected to, the ground of objection is not shown in the bills now being considered, and we find no other bill complaining of the reception of such evidence. The bill certifies that no evidence was introduced showing that defendant did or did not know that the grand jury was in session, nor any showing that defendant knew deceased went to Mt. Vernon on the day before the killing, and that there was no evidence showing that deceased or anyone else had made a complaint against defendant for playing cards. The bill further shows that deceased and defendant resided about four hundred yards apart; that defendant's residence was some twenty feet from the road which deceased traveled in going to and from Mt. Vernon. After the evidence was closed defendant made a motion requesting the court to withdraw the evidence as to the grand jury being in session and deceased's trip to Mt. Vernon. The remaining portions of the two bills contain the reasons urged for withdrawal of the evidence, in other

words grounds of objection. It is not certified *as a fact* that defendant did not know the grand jury was in session, or that he did not know deceased had gone to Mt. Vernon the day before the homicide. The evidence having been admitted in the first instance without objection, or if objection was urged at the time of its reception the record being silent as to the grounds then stated, seems to leave the bills without merit. See Harrelson v. State, 60 Texas Crim. Rep. 534, 132 S. W. 783; Hunter v. State, 59 Texas Crim. Rep. 439, 129 S. W. 136 and other authorities cited in paragraph 2, Sec. 1930, Branch's Ann. P. C.

The court charged on murder, manslaughter and self-defense. Defendant filed written objections to the charge specifically excepting because the court had omitted any instruction on defense of property. A number of special charges embracing this issue were requested and refused. In determining whether the issue was in the case it is necessary to consider the evidence of defendant and his wife. He testified that he had picked and sold three bales of cotton, placing the rent in the bank at Mt. Vernon; that after he had sold two bales deceased spoke to him about the rent and defendant told him he had left it in the bank and would write Mt. Horn about it, at that time getting from deceased Mr. Horn's address; that after this conversation he sold another bale, also leaving the rent in the bank; that the evening before the killing he had brought a wagon load of seed cotton from the field and driven it under the shed for the night; that when deceased came the next morning defendant had just about finished hitching his team to the wagon; that when deceased came up he said, "Now, Dick I will haul that cotton, I guess." From this point we quote defendant's testimony.

"Mr. Crone asked me if I had heard from Mt. Horn and I told him I hadn't; that I had written him a second letter and why he hadn't answered I did not know. I then went around the wagon and hooked my other trace and drove out from under the shed. . . . At that time Mr. Crone was between the horses and the lot gate. . . . When I drove from under the shed I stopped because he cursed me and walked to the gate. It wasn't open and I seen I wasn't going to get through. He came on up and said, 'You know Mr. Horn has been beat out of his rent, Gilliam, and I am going to see that he does not this year, and I am going to haul that cotton.' I said, 'I don't know anything about the rent, I put the rent in the bank and the cotton is mine and I am going to haul it.' . . . When we had this conversation he commenced to raise the cotton scales and I said, 'Don't hit me with them scales,' and backs out. That was after he said he was going to haul that cotton. When I got back of the wagon he stopped. When he raised the scales I had the lines and dropped them to get out of

the way. He was then close enough to strike me. He did not say anything else right then and I turned behind the wagon, . . . and started towards the house. . . . He came the other way and says, 'I will stop you.' I was going north in the direction of the gate. When we got somewhere about the gate I stopped and he went on to the gate. Just before he got to the gate within eight or ten feet probably he says, 'You G— d— s— of a b——, I will stop you.' . . . He started towards me and I told him to stop. He had the scales raised in a striking position coming towards me and as he came I stepped back two or three steps and he continued to come and he got within four or five feet of me. When I told him to stop he did not, and I then shot. I was afraid he was going to kill me with those scales.''

Mrs. Gilliam testified that as she went to the house from the cow lot she met deceased in the gate; that after she had gotten into the house the first thing that attracted her attention was some loud cursing. We quote her testimony in this connection.

''I heard the words, 'G— d— you, get on that wagon and come on and I will stop you,' . . . I ran to the east door and when I got there I saw Dick and Mr. Crone. Mr. Crone was standing in the gate turned towards Dick. . . . He was standing and raised the scales which he had in his hands and started towards Dick. He had them drawn over his shoulder. . . . I heard Mr. Crone say, 'You G— d— measley s— of a b——, I will stop you now.' . . . Dick said, 'Stop, Mr. Crone,' but he did not stop. When Dick told him to stop he (Dick) stepped back and Mr. Crone stepped forward. . . . Just as Mr. Crone started forward and Dick stepped back I heard a gun fire.''

Other evidence makes it clear that the "gate" referred to by Mrs. Gilliam was one leading into the road, and used in going from the house to the lots and inclosure where the wagon of seed cotton was under the shed, and the same gate through which defendant would drive the wagon in going to the gin. When deceased was in this gate he was at a point where he would intercept defendant in going to the house on foot, or in driving the wagon into the road. It is not for us to say whether the evidence of defendant and his wife is true, but only to determine if it raises the issue of defense of property. When deceased first came up he told defendant that he (deceased) would haul the cotton; he then inquired if defendant had heard from Horn. The reply expected from Horn was about the rent from the cotton. Deceased then told defendant Horn had been "beat out" of his rent last year, and that he (deceased) was going to see to it that it did not happen again this year, pointedly referring again to the cotton, for immediately following said statement he repeated that he would haul it. Defendant was forced to drop the lines and abandon his journey to the gin when deceased

threatened to strike him with the scales. When first told to stop he was moving towards the gate with the wagon. The gate was partically closed. It was necessary to open it further before the wagon could pass. As defendant went towards the gate on foot he was again told to stop. Mrs. Gilliam claims to have heard deceased tell defendant with an oath to ''get on that wagon and come on and I will stop you.'' While the evidence raises the issue of self-defense, we cannot escape the conclusion that it also raises the issue of defense of property. It appears to be well settled that when the evidence has a tendency to bring the case under the provision of both articles 1105 and 1107 of the Penal Code, it is incumbent on the court to give in charge the law governing the defenses under both articles. (Williams v. State, —— Texas Crim. Rep., ——, 129 S. W. 838, and other cases referred to in that opinion.) Defendant was in possession of the cotton, and was within his rights in hauling it to the gin in preparation for market. Deceased had no right to prevent this. If he used force in the effort to do so defendant had the right to use whatever force was reasonably necessary to repel an aggression upon his property in order to prevent it from being taken from him, even to the extent of killing after every other effort in his power had been made to repel the aggression. (Art. 1110, Subdiv. 4.) Walker v. State, 70 Texas Crim. Rep. 84, 156 S. W. 206; Hopkins v. State, —— Texas Crim. Rep. ——, 53 S. W. 619; Howell v. State, —— Texas Crim. Rep. ——, 57 S. W. 835; Sims v. State, —— Texas Crim. Rep. ——, 44 S. W. 526.

For the reasons heretofore given the judgment must be reversed and the cause remanded.

*Reversed and remanded.*